Richmond

# JANET FARLEY

v.

# ROLAND E. GOODE

March 2, 1979.

Record No. 771244.

Present: All the Justices.

*A. Albert Balavage* for plaintiff in error.

*John J. Brandt (Slenker, Brandt, Jennings & O'Neal,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the Court.

In this malpractice action against a general dentist, we determine the time from which the applicable two-year statute of

limitations began to run on a claim for allegedly negligent diagnosis and treatment.

Appellant Janet Farley, the plaintiff below, filed suit on November 19, 1976, seeking an award of damages against appellee Roland E. Goode, a dentist practicing in Fairfax County. Plaintiff alleged that during a course of treatment by defendant, which extended over a period of years and which ended in August of 1976, defendant "failed to properly examine, diagnose, and treat her for a periodontal disease of her teeth and gums. . . ." With his grounds of defense in which he denied that he was guilty of any negligence, defendant filed a plea of the statute of limitations.

At the trial on the merits and after the plaintiff had presented her case-in-chief, the court below sustained defendant's motion to strike the plaintiff's evidence, ruling that the action was time-barred. We granted plaintiff a writ of error to the June 1977 final order entering summary judgment in favor of the defendant and dismissing her suit.

Viewing the evidence, as we must, in a light most favorable to the plaintiff, the record shows that in 1966, when plaintiff was about 30 years of age and married, she selected defendant as "a family dentist." From 1966 to 1969, defendant examined and treated plaintiff on at least 20 occasions for her dental problems. During this period of time, defendant took X-rays of her mouth, recommended "root canals" for several teeth, cleaned her teeth, filled some teeth, had at least one temporary tooth made for her, offered a "treatment plan" for crown and bridge work, placed a temporary upper partial denture in her mouth, and performed necessary crown and bridge work during which 12 upper and four lower teeth were "capped".

From September of 1969 to June of 1972, plaintiff did not see defendant for treatment. Plaintiff's explanation for this hiatus was that defendant had stated her "teeth would last a lifetime". Defendant advised, according to plaintiff, that she should brush her teeth "very lightly in order not to wear the plastic [caps] off", so she thought her "mouth was in good shape" and "saw no reason to go have my teeth cleaned."

Plaintiff returned to defendant for treatment on June 14, 1972, either for "cleaning and check" or "for a cavity." She next saw defendant on two occasions during 1973 complaining of bleeding gums and because of her concern that "the caps were wearing off and the gold underneath was showing".

Plaintiff next visited defendant in January of 1974, at which time X-rays of her mouth were taken. Plaintiff testified that she saw defendant twice in November of 1974 because she was "having some bleeding". Again, according to plaintiff, defendant stated that her teeth were "in good shape" and that they would "last a lifetime because they [had] been capped." During one of the November visits, plaintiff told defendant that her teeth "in the lower right section" were loose and that "two teeth in the front were spreading apart".

Plaintiff was not treated by defendant during 1975. In 1976, according to plaintiff's testimony, she visited defendant on "several" occasions when her teeth were loose, and defendant performed "filling work".

Plaintiff saw defendant for the last time professionally on August 23, 1976. On that date, plaintiff went to defendant's office because one tooth was "very loose". She testified that following an X-ray, defendant advised she had experienced "bone loss" and that the tooth must be extracted. Plaintiff stated that in response to her inquiry as to the cause of her bone loss, defendant told her that her "bite was probably off." Plaintiff testified that at no time during that visit, or at any other time during his course of treatment, did defendant make any reference to periodontal disease.

Because of her concern about having had a tooth extracted "which was very close to the front of my mouth", plaintiff obtained an appointment to see Dr. David C. Buckis, who was in the general practice of dentistry in Centreville. Upon his first examination, Buckis observed that plaintiff's teeth were loose and determined that she had lost the "attachment apparatus" in the right side of her mouth. Because the looseness seemed "extensive", Buckis immediately referred plaintiff to Dr. John Armstrong, a periodontist with offices in Fall Church.

When Armstrong first examined the plaintiff within two weeks of her last visit to defendant, Armstrong determined that she had "advanced periodontal disease". Armstrong testified that this disease, of which the dental profession had become "rather acutely aware" during "the past ten years", affects the tooth and the gum around the tooth, resulting in destruction of the bone. He stated that the disease, which develops slowly and gets progressively worse if untreated, is caused by inflammation which in turn is caused by bacteria.

The first oral examination by Armstrong revealed bone loss around most of the teeth, dental decay, red gum margins and looseness of teeth. A probing examination, conducted with a hand instrument calibrated in millimeters and placed between the tooth and the gum, revealed "pocket depths" far in excess of a "normal" depth of two millimeters. The plaintiff's medical testimony indicated that the gum tissue is usually attached very tightly within "a couple of millimeters of where the edge of the gum line is" and when periodontal disease develops, "this attachment migrates or comes away from the tooth" and a "pocket" or "space" results.

The expert testimony further showed that as early as in 1971, the plaintiff had an "active periodontal disease" which should have been discovered then by a general dentist exercising ordinary care in the Northern Virginia dental community. The testimony also showed that it was standard practice in that area of the state for a dentist routinely to examine a patient for periodontal disease when the patient would come in for "other work", such as treatment of teeth which had been "capped" or for mouth X-rays. In addition, Buckis testified that the practice in the area was to instruct a patient such as plaintiff, in whose mouth "appliances" had been installed, in the proper techniques for cleaning the teeth and for using dental floss so that these methods of dental hygiene would remove the bacteria which created the "periodontal problem." The plaintiff testified that defendant never gave her any instructions on such procedures.

The evidence further showed that had the periodontal condition been discovered in 1971 or soon thereafter, it could have been arrested and controlled with a minimal amount of treatment at a cost of about $700. The record also reveals that, as of the time of trial, the treatment which would be necessary to arrest the disease, including surgery and repositioning of the teeth, would cost approximately $10,000. In addition, according to the evidence, plaintiff would be required to regularly see a periodontist for a visit lasting an hour and a half every three to four months over a period of 20 years for "maintenance activity" in order to preserve the work to be done by Buckis and Armstrong in treating the plaintiff's disease.

In sustaining the plea of the two-year statute of limitations, the court below relied on *Hawks* v. *Dehart,* 206 Va. 810, 146 S.E.2d 187 (1966), and *Morgan* v. *Schlanger,* 374 F.2d 235 (4th Cir. 1967). The trial judge ruled, in effect, that the periodontal disease existed prior to November 19, 1974; that plaintiff's evidence showed a

breach of duty by defendant before that time, which, of course, was more than two years before this suit was filed on November 19, 1976; that plaintiff's cause of action thus accrued before November of 1974 when the defendant first negligently failed to diagnose and treat the condition; and that it did not accrue when plaintiff discovered defendant's negligent conduct.

On appeal, plaintiff argues that defendant's regular "treatment of Farley up to the year 1976, . . . constituted continuing negligence and thus, Farley should be entitled to . . . present her claim for full damages as a result of the cumulative effect thereof . . . ." She contends that her "case falls within the . . . rules of continuing treatment, or continuing negligence or continuing service . . . , and that so far as her proofs will allow, [she should] have her damages determined from the time of initial negligence . . . ."

Responding to that argument, defendant contends that to apply a continuing treatment rule to this case would encroach upon "the fixed Virginia principle that the right to sue accrues on the date of the injury", *citing Caudill* v. *Wise Rambler, Inc.*, 210 Va. 11, 168 S.E.2d 257 (1969). Defendant points out that plaintiff's expert testimony clearly showed that the periodontal disease was present before 1974 "and should have been attended to in 1971". Thus, defendant notes, "the claimed acts of dental malpractice, to-wit: failure to diagnose and treat periodontal disease," occurred a "considerable period of time before" 1974, and "her cause of action obviously accrued" at that earlier time. Relying on *Hawks* v. *DeHart* and *Morgan* v. *Schlanger*, defendant says we should decline to apply a continuing treatment rule to the facts of this case, also stating certain policy reasons why the application of such a concept should be rejected. We do not agree with defendant's contentions.

In *Hawks* v. *DeHart*, the plaintiff sued the defendant physician in 1963 for damages alleged to have been caused by his negligence in leaving a surgical needle in plaintiff's neck in the course of a goiter operation performed by him in 1946. The *Hawks* record showed that plaintiff did not consult defendant concerning the goiter operation after 1946 and did not "see" him medically after 1949. The court assumed without deciding that the evidence showed that plaintiff could not be charged with knowledge of the wrong until 1962. Then Code § 8-24 (now with minor changes, Code § 8.01-243(A)), which was also effective at the time the instant suit was filed, provided that every action for personal injuries should be brought "within two years next after the right to bring the same

shall have accrued." This court said that Virginia is committed to the rule that, in the absence of special circumstances such as disability of the plaintiff or fraudulent concealment by defendant, the limitation on the right to sue begins to run when the wrong is done and not when the plaintiff discovers that he has been damaged. The court noted that we had adhered to that principle in *Richmond Redevelopment & Housing Authority* v. *Laburnum Construction Corp.*, 195 Va. 827, 80 S.E.2d 574 (1954), in which the court held that the limitation of the action began to run when the wrongful act was done in 1943 and not when the damage occurred and the wrongful act was discovered in 1948. In *Hawks,* we noted that the *Laburnum* court said that the difficulty in determining that a cause of action exists plays no part in the general rule.

In *Laburnum,* the Housing Authority sued in 1949 to recover damages for the destruction of one of its housing units by a 1948 explosion allegedly due to a defective union in a gas pipe installed by defendant's subcontractor not later than 1943. The trial court held that the action was time-barred. This court affirmed, and rejected plaintiff's argument that the period of limitation did not begin to run until the defect was discovered at the time of the explosion. We quoted from an earlier case and said: "'Therefore, as a general rule, where an injury, though slight, is sustained in consequence of the wrongful or negligent act of another and the law affords a remedy therefor the statute of limitations attaches at once. It is not material that all the damages resulting from the act should have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date. The act itself is regarded as the ground of the action and is not legally severable from its consequence.'" 195 Va. at 839, 80 S.E.2d at 581, *quoting from Street* v. *Consumers Mining Corp.*, 185 Va. 561, 566, 39 S.E.2d 271, 272 (1946).

In *Caudill* v. *Wise Rambler, Inc.*, 210 Va. 11, 168 S.E.2d 257 (1969), we determined, not inconsistently with *Laburnum,* that the cause of action for personal injury arose at the time of injury and not at the time plaintiff purchased the defective automobile which caused the injury. We said that when plaintiff purchased the vehicle, the breach of an implied warranty of fitness occurred and plaintiff's cause of action against defendants for property damage accrued. At the same time, the court said, plaintiff had a potential cause of action for personal injuries which did not accrue until she was injured. Thus, plaintiff's personal injury action filed within two

years of the date of the injury was timely.

But none of the foregoing cases controls a decision of the issue presented by this set of facts. In each of those cases the cause of action stemmed from a single, isolated, non-continuing wrongful act. Here, the right of action arose from a continuous tort in which the negligent failure to diagnose properly resulted in omission to perform or recommend necessary treatment.

Here, the defendant undertook to care for the plaintiff's teeth. Plaintiff submitted herself to defendant's care regularly from 1972 onward. Expert testimony indicated that the periodontal disease was discoverable as early as 1971. Nevertheless, the defendant failed to diagnose the problem and continued to reassure plaintiff that her teeth were in sound condition from 1972 to 1976. This course of examination and resulting failure to treat was shown to have been based upon a mistaken diagnosis and to not have been of a character employed in the geographical area in question by the dental profession in dealing with cases of periodontal disease.

Accordingly, the question presented in this case is: Does the right to bring a malpractice action in tort for personal injuries accrue at the inception of continuously negligent examination and treatment or at the end thereof? For the purpose of ruling on this issue only and consistent with our duty to view the evidence in a light favorable to plaintiff, we will assume that the examination and treatment of plaintiff by defendant from June of 1972 through August of 1976 was, as a matter of fact, continuous and substantially uninterrupted.

We hold under these facts that when malpractice is claimed to have occurred during a continuous and substantially uninterrupted course of examination and treatment in which a particular illness or condition should have been diagnosed in the exercise of reasonable care, the date of injury occurs, the cause of action for that malpractice accrues, and the statute of limitations commences to run when the improper course of examination, and treatment if any, for the particular malady terminates. See Schmit v. Esser, 183 Minn. 354, 358-59, 236 N.W. 622, 624-25 (1931); Williams v. Elias, 140 Neb. 656, 663, 1 N.W.2d 121, 124 (1941); Borgia v. City of New York, 12 N.Y.2d 151, 155-57, 187 N.E.2d 777, 778-79, 237 N.Y.S.2d 319, 321-22 (1962). Here, the duty with reference to an accurate diagnosis persisted throughout the entire treatment because upon each diagnosis rested the correctness of any future conduct in respect to the periodontal disease. See 31 Fordham L. Rev. 842, 843 (1963). We believe that the duration of

the cause of action, within the narrow context of the limitation problem, was "coextensive with the tortious conduct" and "that the whole transaction was inherently negligent". *Id.* Consequently, since the dentist-patient relationship with respect to the malady involved here terminated on August 23, 1976, when the plaintiff last visited the defendant for treatment, the plaintiff's suit, filed on November 19, 1976, was brought within the applicable two-year statute of limitations.

The approach we adopt in this case has been embraced by a number of other courts. *See* 1 D. Louisell & H. Williams, *Medical Malpractice* § 13.08 (1977). For example, in *Schmit* v. *Esser, supra,* negligent care and treatment by the defendant physician of a dislocation and fracture of plaintiff's leg began with the date of the injury in March of 1926 and continued to the following August. The plaintiff's evidence showed that during that period defendant was employed generally to treat, care for and heal the injury. The court said that under those circumstances, the physician owed the duty of giving continued care and treatment and if the jury found that defendant was negligent in failing to apply proper treatment during examinations in July and August, the action commenced in June of 1928 was not barred by the two-year statute of limitations. The court considered the treatment and employment as a whole and stated that "if there occurred therein malpractice the statute of limitations begins to run when the treatment ceases." 183 Minn. at 358, 236 N.W. at 624. The court further said:

> So long as the relation of physician and patient continues as to the particular injury or malady which he is employed to cure, and the physician continues to attend and examine the patient in relation thereto, and there is something more to be done by the physician in order to effect a cure, it cannot be said that the treatment has ceased. That does not mean that there must be a formal discharge of the physician or any formal termination of his employment. If there is nothing more to be done by the physician as to the particular injury or malady which he was employed to treat, or if he ceases to attend the patient therefor, the treatment ordinarily ceases without any formality.

183 Minn. at 358-59, 236 N.W. at 625.

Similarly, in *Williams* v. *Elias, supra,* the defendant physician and surgeon was charged with negligently diagnosing and treating plaintiff's injured back over a period of about four months. The trial court held that the two-year limitation on malpractice actions began to run on the day of defendant's initial examination of plaintiff when the physician breached his duty and failed to correctly diagnose the cause of plaintiff's disability. The Supreme Court of Nebraska reversed, holding that the tort continued through the entire course of defendant's treatment of plaintiff for that condition and that with each incorrect diagnosis, the plaintiff's injuries were extended. The court observed that to reject a continuing treatment rule under the circumstances of that case, and to adhere to a rule in which the limitation on the right to sue begins to run at the inception of the course of treatment, would generate suits in the midst of a course of treatment. The court said that "it is just to the physician and surgeon that he may not be harassed by premature litigation instituted in order to save the right of the patient in the event there should be substantial malpractice." 140 Neb. at 662, 1 N.W.2d at 124. Noting that the physician should have all reasonable time and opportunity to correct mistakes which may be made at the beginning of a course of treatment, the court stated that this continuing treatment rule "is conducive to that mutual confidence which is highly essential in the relation between [physician] and patient. The treatment and employment should be considered as a whole, and if there occurred therein malpractice, the statute of limitations should begin to run when the treatment ceased." *Id.* at 663, 1 N.W.2d at 124.

Likewise, in *Borgia* v. *City of New York, supra,* the infant plaintiff and his father sued the municipality for malpractice which occurred during a course of treatment extending over the child's 16-month stay at a public hospital. The question presented, bearing on whether a timely notice of claim was filed with the City, was: Did the cause of action "accrue" on the date of a negligent act or omission, or at the end of a continuous course of medical treatment by the hospital? The Court of Appeals of New York approved the "end of continuous treatment" formula for computing time limitations. The court held that "at least when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the 'accrual' comes only at the end of the treatment."

12 N.Y.2d at 155, 187 N.E.2d at 778, 237 N.Y.S.2d at 321. The court stated, and we agree, that little argument is needed to demonstrate that the "continuous treatment" theory is a fairer one under these circumstances. The court said: "It would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician or hospital superintendent or by filing a notice of claim in the case of a city hospital." 12 N.Y.2d at 156, 187 N.E.2d at 779, 237 N.Y.S.2d at 321-22.

We observe, as pointed out by the *Borgia* court, that by "continuous treatment" we do not mean mere continuity of a general physician-patient relationship; we mean diagnosis and treatment "for the same or related illnesses or injuries, continuing after the alleged acts of malpractice. . . ." 12 N.Y.2d at 157, 187 N.E.2d at 779, 237 N.Y.S.2d at 322.

Also, in *Hotelling* v. *Walther*, 169 Ore. 559, 130 P.2d 944 (1942), the defendant dentist was charged with malpractice when he only partially extracted a lower wisdom tooth leaving broken parts of the roots in the tooth socket. The negligence was predicated on defendant's failure to use due care and skill in subsequently diagnosing the cause of plaintiff's trouble and in permitting the broken parts to remain in the mouth. Defendant treated plaintiff from the time of the extraction in July of 1938 to October of 1939. During this period, plaintiff's condition became progressively worse. Defendant contended that the cause of action accrued when the tooth was extracted and that the two-year limitation barred the action filed in September of 1940.

The Supreme Court of Oregon held that the cause of action accrued when the defendant ceased the negligent treatment. The court said that the alleged negligent treatment of the plaintiff must be considered as a whole and that the plaintiff was not obliged to split his cause of action. The court stated that there was a continuing duty on defendant to exercise due care and skill in diagnosing the cause of the infection surrounding the tooth socket. There, the tort was continuing and the right of action was held to be continuing. The Oregon court also observed that the rule "that the statute runs from the last date of the continuous negligent treatment is just and equitable. A rule to the contrary often results in miscarriage of justice and penalizes a patient who, under continuous treatment, assumes that due care and skill will be exercised." 169 Ore. at 565, 130 P.2d at 946-47. *But see* Ore. Rev. Stat. § 12.110 (1975).

This is not the first time we have recognized a continuing negligence theory resulting in a statute of limitations commencing to run at the termination of an undertaking. Such a rule was applied as early as 1905 in a case involving the sale of land by an attorney on behalf of a client. *Wilson* v. *Miller,* 104 Va. 446, 51 S.E. 837 (1905). And the rule was reaffirmed in *McCormick* v. *Romans & Gunn,* 214 Va. 144, 198 S.E.2d 651 (1973), in which we stated: "[W]here there is an undertaking which requires a continuation of services, the statute of limitations does not begin to run until the termination of the undertaking." *Id.* at 148, 198 S.E.2d at 654. In *McCormick,* we noted that such a rule was particularly appropriate in view of the confidence and trust inherent in the attorney-client relationship. *Id.* at 149, 198 S.E.2d at 655. The dentist-patient relationship is likewise marked by confidence and trust.

Parenthetically, we note that the rule applied today presupposes that a continuous course of improper examination or treatment which is substantially uninterrupted is proved as a matter of fact. Where the malpractice complained of constitutes a single, isolated act, however, the rule of decision announced in *Hawks* v. *DeHart, supra,* will continue to apply.*

█ Finally, we address defendant's reliance on *Morgan* v. *Schlanger, supra,* decided one year after *Hawks* v. *DeHart,* in which a panel of the United States Court of Appeals for the Fourth Circuit, applying Virginia law, declined to adopt a continuing treatment rule in a case in which the plaintiff was continually under the care of the defendant physicians who were charged with malpractice. The court concluded that "Virginia would not, in an appropriate case, embrace the continuing treatment rule." 374 F.2d at 240.

This conclusion was based on our language in *Hawks* in which we said, after deciding that the limitation there began at the time the wrong was committed, that: "There are cases to the contrary, fixing the discovery of damage *or other events as the time when*

---

* The rule of *Hawks,* that the statute of limitations commences to run from the date of the injury was recently applied in *Comptroller of Virginia ex rel. Virginia Military Institute* v. *King,* 217 Va. 751, 760, 232 S.E.2d 895, 900, decided March 4, 1977. We noted that any change in the rule to provide that the statute begins to run from the discovery of the wrong should be made by the General Assembly. The Virginia Code Commission recommended that a discovery rule be adopted in malpractice cases in its 1976 report. House Document No. 14, at 158-59 (1977). The 1977 General Assembly rejected the proposed change when it enacted Title 8.01 of the Code, approved April 1, 1977, to become effective October 1, 1977. Acts 1977, ch. 617, at 1052, 1174. *See* Code §§ 8.01-230 & -249.

*the limitation begins, e.g.,* Morgan *v.* Grace Hospital, Inc., (W.Va.), 144 S.E.2d 156; . . . ." 206 Va. at 814, 146 S.E.2d at 189 (emphasis added by the court in *Schlanger*, 374 F.2d at 240). We then went on in *Hawks* to emphasize that in cases where a foreign body is negligently left in a patient during surgery, the cause of action accrues at the closing of the incision and not from a later discovery of the wrongful act.

In *Schlanger*, referring to our language in *Hawks*, the Fourth Circuit stated that:

> While the Court, on the facts of the case, was rejecting only the discovery rule, the emphasized language indicates to us a rejection of any acceptance of any exception, other than legal disability of the plaintiff because of infancy or insanity or actual fraud on the part of a defendant in concealment of a cause of action, to the general tort rule of that state. Particularly is this so because the West Virginia *Morgan* case, which the Virginia case rejected, discussed, *inter alia,* the continuing treatment rule.

374 F.2d at 240.

But the only discussion in *Morgan* of any form of a continuing treatment rule came at one point in the opinion when the court in passing noted the "various exceptions to or qualifications of the rule that the period of limitation commences to run from the date of the act of malpractice rather than from the date of its discovery." 149 W.Va. at 786, 144 S.E.2d at 158. The court then listed "some" of those rules among which was that the "statute does not commence to run so long as the physician's treatment of the patient continues". *Id.* Other rules listed were all either some form of a "date of discovery" rule or a variation of the "date of the wrong" rule. Consequently, because the West Virginia Court of Appeals in *Morgan* adopted a discovery rule and not a continuing treatment rule, our reference in *Hawks* to the West Virginia decision should not have necessarily signalled a blanket rejection of all exceptions to the "date of the wrong" rule. Accordingly, we are not persuaded by defendant's contention that what was said in *Hawks* forecloses our application of the continuing treatment rule which we adopt today.

For these reasons, we believe the trial court erred in sustaining the defendant's plea of the statute of limitations. Therefore, the judgment order appealed from will be reversed and the case will be remanded for a new trial.

*Reversed and remanded.*