# CIRCUIT COURT OF FAIRFAX COUNTY

Lynn Painter

v.

Sadhna N. Singh et al.

November 13, 2006

Case No. CL-2006-496

BY JUDGE ROBERT W. WOOLDRIDGE, JR.

This matter comes before me on the plea in bar of Defendant Sadhna N. Singh, M.D. to the Complaint filed against her on January 17, 2006, by Plaintiff Lynn Painter. The Complaint alleges medical negligence by Dr. Singh in relation to a delivery of a baby by Ms. Painter in September 1996. Ms. Painter contends that Dr. Singh negligently left a surgical needle inside her following an episiotomy performed at the conclusion of the delivery. Ms. Painter filed her original motion for judgment on March 12, 2004. She nonsuited that case on July 27, 2005, and filed the Complaint on January 17,

2006. Dr. Singh contends in her plea in bar that the original motion for judgment was filed outside of the statute of limitations, and hence the cause of action referenced in the Complaint is time-barred.

At the hearing on the plea in bar, I heard testimony from Ms. Painter and Dr. Singh. I found Ms. Painter's testimony to be credible and believable. I found Dr. Singh's testimony to be far less so. When their testimony conflicted, I have found Ms. Painter's version of the events that transpired to be accurate and persuasive. I also received testimony by way of deposition transcripts from Dr. Neda Hashemi, Dr. Hans Krebs, Dr. Stacy Oshry, Mary Jo Doyle (a registered nurse in Dr. Oshry's office), Dr. Michael W. A. Ivy, and Ms. Painter. Based on all the evidence provided, I make the following factual findings.

In March 1996, Ms. Painter became a patient of Dr. Singh's in connection with her pregnancy. In September 1996, Dr. Singh delivered Ms. Painter's second child and performed a related episiotomy. In February 1997, Ms. Painter consulted Dr. Singh complaining of pelvic pain. Dr. Singh performed a physical examination and a sonogram and found no abnormality. Ms. Painter next saw Dr. Singh in September 1997, at which time she did not complain of pelvic pain. Mr. Painter saw Dr. Singh for roughly annual physical examinations thereafter, but did not complain of pelvic pain during those visits.

On February 10, 2003, Ms. Painter experienced sharp pain in her mid-back and went to the emergency room. She was told that she might have a kidney stone and was referred to an urologist. By the time she saw an urologist on February 21, she had already passed the kidney stone. The pain in her mid-back was gone but she had pain in her lower back. On February 25, she consulted her primary care physician, who referred her for an x-ray. At the time Ms. Painter thought her lower back pain might be related to a tailbone injury from long ago.

She had an x-ray on February 25, 2003, and the radiologist told her the x-rays showed the presence in her vaginal area of something that might be an intrauterine device (IUD). Ms. Painter knew that she had never used an IUD. In the next few days, Ms. Painter looked at the x-rays herself and thought she could see an object displayed on them.

On February 27, 2003, Ms. Painter consulted Dr. Singh, taking her x-rays with her. On her arrival at the office, Ms. Painter handed the x-rays to Dr. Singh's nurse. The nurse did not examine the x-rays in Ms. Painter's presence. When Dr. Singh came in to see Ms. Painter, Ms. Painter told her about her pelvic pain, that her primary care physician sent her to have x-rays, that the radiologist had told her he saw something that might be an IUD, that she never

used an IUD, and that the radiologist had suggested she see an ob/gyn. She also advised Dr. Singh that she had the x-rays with her, although she was not certain that Dr. Singh heard her say that.

Dr. Singh performed a digital pelvic examination on Ms. Painter, and told Ms. Painter "I feel something." Ms. Painter again advised Dr. Singh that she had her x-rays with her. Dr. Singh asked to see them and called Dr. Hashemi into the examining room. Dr. Singh pulled the x-rays out and held them up, whereupon both Dr. Singh and Dr. Hashemi together said "That's a suture needle." Dr. Hashemi soon left the room. Dr. Singh began rubbing Ms. Painter's forehead and saying over and over again that she, Dr. Singh, was sorry and that this had never happened to her before. Dr. Singh said that she and her nurses were supposed to count needles. She kept apologizing to Ms. Painter. At that time, no other suggestion was made by Dr. Singh as to the nature of the object.

Dr. Singh then took Ms. Painter into a nearby sonogram room and told the sonogram technician that she wanted to do the sonogram herself, which she did. In Ms. Painter's presence and during the course of the sonogram, Dr. Singh said "There it is." The sonogram technician said that the only thing it could be was a navel ring or body piercing. Dr. Singh did not reply to that comment.

The following day, Dr. Singh called Ms. Painter and advised her that she, Dr. Singh, "did not think she did it," that it could have been left over from Ms. Painter's first delivery, and that the object could be a surgical clip from a tailbone injury. In additional calls to Ms. Painter during the next day or two, Dr. Singh reiterated those views and also told Ms. Painter that she, Dr. Singh, had a surgical colleague who would remove the object from Ms. Painter at no cost to Ms. Painter. Ms. Painter understood from the calls following February 27 that Dr. Singh believed that the object inside Ms. Painter was anything but an episiotomy needle left there by the Dr. Singh.

A week or two later, Dr. Hashemi asked Dr. Singh about Ms. Painter. Dr. Singh replied that she had sent Ms. Painter to a surgeon and that the suture needle was from a body piercing. Ms. Painter had never had any vaginal piercing. Dr. Singh had no information suggesting that Ms. Painter had any vaginal piercing. Ms. Painter did have a navel ring that she got in 2000, but has never had any vaginal piercing.

In late February, Ms Painter called her primary care physician, Dr. Stacy Oshry, and spoke with her about the radiologist report. A few days later, on February 28, 2006, Ms. Painter called Dr. Oshry's office and spoke to Mary Jo Doyle, a registered nurse. In a conversation documented in the patient's records, Ms. Painter told Nurse Doyle that the object inside her

was an episiotomy needle from the birth of her child seven years before, that she needed surgery, and that she wished to discuss the matter with Dr. Oshry.

Although uncertain how she came by his name, Ms. Painter saw Dr. Krebs on March 14, 2006. On the patient history questionnaire that she filled out on arriving at Dr. Krebs' office, in response to the request to "Please List Any Problems You Would Like to Talk About or Be Examined For," Ms. Painter wrote: "Suture needle left inside body from episiotomy during birth of daughter on 9/3/96." She testified that she went to see Dr. Krebs because she wanted to find out what was really inside her. She did not trust what Dr. Singh had told her. She did not take her x-rays to Dr. Krebs and does not remember if she showed him the x-ray report. Dr. Krebs did a digital vaginal examination of Ms. Painter. The findings from the vaginal examination were inconclusive, and, without the x-rays, Dr. Krebs was able to offer her little in the way of advice or opinion.

On March 20, Ms. Painter consulted Dr. Ivy because she did not feel comfortable with either Dr. Singh or Dr. Krebs. Although Ms. Painter trusted Dr. Singh when Dr. Singh apologized in the office and told her that the object was a surgical needle, she did not trust Dr. Singh as a result of the subsequent phone calls, "backpedaling," and suggestions that the first pregnancy or pelvic surgery was to blame. She told Dr. Ivy of her complaint of pain but did not tell him initially what she had been told by the other physicians. She wanted to see what he would find without that information because she did not trust the reliability of the information she had been given by the radiologist, Dr. Singh, or Dr. Krebs. Dr. Ivy performed a digital vaginal examination and said he felt something abnormal. During that examination, Ms. Painter experienced sharp pain and jumped in reaction to Dr. Ivy apparently hitting the object. Ms. Painter then gave the x-rays to Dr. Ivy and told him of her previous encounters with the radiologist, Dr. Singh, and Dr. Krebs. Following his physical exam of Ms. Painter and review of the x-rays, Dr. Ivy made it clear to Ms. Painter that the object inside her was a suture needle.

Before seeing Dr. Ivy, Ms. Painter was mistrustful of the varying descriptions of the object inside of her. She also had previously had dysplasia, had a biopsy while pregnant, and had a lump removed after delivery. She did not know if the lump was reappearing.

Section 8.01-243(C)(1) of the Code of Virginia provides the statute of limitations that governs under these circumstances:

In cases arising out of a foreign object having no therapeutic or diagnostic effect being left in a patient's body, for a period of one year from the date the object is discovered or reasonably should have been discovered.

Section 8.01-243(C)(2) of the Code also provides:

In cases in which fraud, concealment, or intentional misrepresentation prevented discovery of the injury within the two-year period, for one year from the date the injury is discovered or, by the exercise of due diligence, reasonably should have been discovered.

Ms. Painter contends that Dr. Singh's conduct on and in the weeks following February 27, 2003, constituted fraud, concealment, or intentional misrepresentation that prevented discovery of her injury. Assuming without deciding that they did, I find that such conduct does not trigger the limitations period contained in § 8.01-243(C)(2). That provision only applies to fraud, concealment, or intentional misrepresentation that prevents discovery of the injury "*within the two-year period.*" The "two-year period" refers to § 8.01-243(A), which requires actions for personal injury to be brought within two years after the cause of action accrues. Here, Dr. Singh's alleged fraud and misrepresentation occurred nearly seven years after the delivery of Ms. Painter's child. They did not prevent discovery of the injury to her within two years of the accrual of the cause of action.

I also find that the continuing treatment rule does not serve to extend the statute of limitations. In Virginia, when the alleged medical malpractice is claimed to have occurred during a continuous and substantially uninterrupted course of treatment, the statute of limitations begins to run when the improper course of treatment terminates, rather than from the initial incident of malpractice. *Farley v. Goode*, 219 Va. 969, 252 S.E.2d 594 (1979). The continuing treatment rule is not limited to a specific period of years nor does treatment of the plaintiff by other physicians break the continuity of the defendant physician's treatment. However, the continuing treatment rule does not apply in cases of "mere continuity of a general physician-patient relationship;" rather, there must be continued diagnosis and treatment by the physician for the same illness or injury from which the alleged malpractice arose. *Farley*, 219 Va. at 979. There was no evidence presented that Ms. Painter complained of pelvic pain in any of her annual physical exams after September 1997 or that Dr. Singh treated Ms. Painter for pelvic pain in her

yearly consultations. Thus, I find that Dr. Singh's treatment of Ms. Painter over the years was a mere continuation of the general physician-patient relationship, not falling under the continuing treatment rule.

Therefore, whether the original motion for judgment was timely filed on March 12, 2004, turns on whether Ms. Painter discovered or reasonably should have discovered before March 12, 2003, that a foreign object having no therapeutic or diagnostic effect was left in her body. I find that Ms. Painter discovered or reasonably should have discovered the presence of a foreign object within her body by the end of February 2003. When she consulted Dr. Singh on February 27, 2003, Ms. Painter already was aware that her x-rays showed the presence of something unusual and unexplained within her vaginal area. Dr. Singh performed a pelvic examination on Ms. Painter and informed her that she, Dr. Singh, could feel "something" within Ms. Painter's body. Ms. Painter then heard both Dr. Singh and Dr. Hashemi say together "That's a suture needle" after both doctors saw Ms. Painter's x-rays. Dr. Singh then apologized profusely to Ms. Painter and told her that she, Dr. Singh, and the nurses were supposed to count needles. Dr. Singh then performed a sonogram examination on Ms. Painter and, during the course of the examination, remarked "There it is."

Dr. Singh's alleged attempt to conceal the nature of the object within Ms. Painter's body does not alter when Ms. Painter discovered or should have discovered that there was something foreign inside her. Va. Code § 8.01-243(C)(1) does not require that a patient discover the exact nature of the foreign object within her body, merely the presence of the object. Ms. Painter had been told by the radiologist on February 25 that there was something inside her; Ms. Painter knew that what the radiologist suggested was present, an IUD remnant, was incorrect because she did not use an IUD. Dr. Singh and Dr. Hashemi both told her on February 27 that it was a suture needle. Dr. Singh's later attempts to convince Ms. Painter that the object could have been left behind from a previous delivery or may be a surgical clip could only serve to reinforce Ms. Painter's realization that a foreign object was present within her body, regardless of the exact nature of the object or its origin. None of the various explanations given to Ms. Painter or considered by her involved an object with therapeutic or diagnostic benefit or any object that she would not have considered "foreign" to her. Ms. Painter's call to Dr. Oshry's office on February 28, 2003, advising Dr. Oshry's nurse that the object inside her was an episiotomy needle and that she needed surgery, further demonstrates that she knew of the presence of a foreign object inside her by that date.

The circumstances that Ms. Painter found herself facing were much more than sad; they were horribly unwarranted and unwanted. Unfortunately, that does not alter the consequences in the law of the timing of her filing suit. Despite any uncertainty as to precisely what the object was, by the end of February 2003, Ms. Painter discovered or reasonably should have discovered that a foreign object having no therapeutic or diagnostic benefit had been left in her body. The statute of limitations for Ms. Painter's cause of action was thus tolled no later the close of February 2004. Since Ms. Painter's original motion for judgment was not filed until March 12, 2004, her claim is time-barred. Therefore, the Defendants' Plea in Bar is sustained and the Plaintiff's action is dismissed.