NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1150                                          Appeals Court

WILLIAM PARR[1]  vs.  DANIEL ROSENTHAL.

No. 13-P-1150.

Essex.      September 8, 2014. - August 7, 2015.

Present:  Trainor, Rubin, & Sullivan, JJ.

Limitations, Statute of.  Negligence, Doctor.  Medical
     Malpractice, Statute of limitations.

Civil action commenced in the Superior Court Department on
March 9, 2009.

The case was heard by Thomas R. Murtagh, J., and a motion
for a new trial was heard by him.

Douglas Smith for the plaintiff.
James S. Hamrock, Jr., for the defendant.

TRAINOR, J.  The plaintiff brought a medical malpractice

action against the defendant.  The jury concluded, pursuant to

the judge's instructions, that the statute of limitations had

run because the plaintiff knew or reasonably should have known

_____

[1] By his parents and next friends, Michael and Michelle
Parr.

more than three years before filing his complaint that he had been harmed by the defendant.[2,3]  Judgment entered for the defendant, and the plaintiff's subsequent motion for a new trial was denied.  The plaintiff appeals, arguing that it was error to deny his requested instruction concerning the continuing treatment doctrine as a mechanism for tolling the statute of limitations.[4]  We conclude that the continuing treatment doctrine is applicable in Massachusetts and is fairly raised by the facts presented at trial.

Factual background.  We review the evidence presented at trial that is relevant to the requested instruction on the

---

[2] The statute of limitations for a medical malpractice action requires that the suit "commence[] only within three years after the cause of action accrues."  G. L. c. 260, § 4, second par., inserted by St. 1986, c. 351, § 30.

[3] We were not provided with the special verdict question jury slip.  However, both parties agree that judgment entered for the defendant due to the jury's finding on the statute of limitations special verdict question.  The judge's instructions indicate the special verdict question was:

"Did the plaintiffs know or should they reasonably have known prior [to] March 6th, 2006, . . . that they had been harmed by the conduct of the defendant?"

[4] The plaintiff initially raised an argument that the jury also should have been instructed on fraudulent concealment and equitable tolling as mechanisms for tolling the statute of limitations.  However, in his reply brief, the plaintiff concedes that the fraudulent concealment argument was waived by failure to object below and indicated that the equitable tolling doctrine was only pressed as an alternative to the continuing treatment instruction.  As a result, we will not address either the fraudulent concealment or the equitable tolling argument.

continuing treatment doctrine.[5]  The cause of action arose out of

a radiofrequency ablation (RFA) procedure that was performed by

the defendant on November 4, 2005, and resulted in a burn to and

the eventual amputation of William's[6,7] leg.

William was born with a lump in his right leg.  Within a

few weeks of William's birth the Parrs were referred to the

sarcoma group at the Massachusetts General Hospital (MGH).[8]  When

William was about eight years old, Dr. Mark Gephardt performed

surgery on the lesion and determined that it was engulfing most

of the calf muscle and impacting William's nerves and blood

vessels.  Dr. Gephardt could remove only a small portion of the

lesion.  Pathology later determined that the lesion was a

---

[5] We provide a review of the relevant evidence that was presented to the jury in order to analyze whether there was a factual basis for providing the continuing treatment doctrine instruction.  Any mention of a fact here in no way implies that it was proven by a preponderance of the evidence or that the jury had to accept or rely upon it.

[6] We refer to William, Mr. Parr, and Mrs. Parr to avoid any confusion between the plaintiff and his parents.

[7] The defendant does not dispute that there was evidence to support the conclusion that "[t]he amputation was required because of the neurological complications caused by the burn injury with inability to move the foot, and persistent infections at the burn wound site."

[8] This medical treatment team or group is also referred to as the connective tissue oncology/radiology conference or the tumor board.

desmoid tumor.[9,10]  Shortly after the surgery Dr. Gephardt left MGH and William's primary care was assumed by Dr. David Ebb, a pediatric oncologist, and Dr. Kevin Raskin, an orthopedic surgeon.[11,12]  Both doctors were members of the sarcoma group.

William was followed for many years and is still cared for by the "sarcoma group in the sarcoma conference."  The defendant has been a member of the sarcoma group since 1978 and continues to be a member of the group.  The sarcoma group is multi-disciplinary and includes "[o]rthopedic oncologists, radiologists, pathologists, radiation oncologists, pediatric oncologists and medical adult oncologists."[13]  The group meets

---

[9] Desmoid tumors are rare and although they do not metastasize and are therefore technically benign they do infiltrate normal tissue and impair bodily function where they develop.

[10] After the surgery, William was also treated with chemotherapy.

[11] Dr. Raskin was not a part of the group when William was first referred to MGH.  Dr. Gephardt later left MGH, and at that time Dr. Raskin became directly involved in William's care.  Dr. Gephardt has not been involved in William's care since he left MGH.

[12] Mrs. Parr identified Drs. Gephardt and Ebb as William's treating physicians at MGH.  Mr. Parr testified that at the beginning William was treated by Dr. Ebb, Dr. Raskin, and Dr. Gephardt.

[13] Dr. Ebb described the group as "very large" and a group that  "essentially includes medical physicians who take care of connective tissue lesions of any description, benign and malignant.  It includes surgeons.  It includes radiologists like Dr. Rosenthal.  It includes surgeons like Dr. Raskin.  And

weekly to discuss both new cases and cases that need to be revisited. Dr. Raskin explained the function of the group as follows: "It's a way of avoiding making decisions in silos. We make them together. We talk about the cases together. Everyone has input from their own specialty. And ideally at the end of a conference day or a discussion, we have a plan. It's a way of coming up with plans." Dr. Raskin also explained that, as part of the group, he has a "very close interdisciplinary relationship[]" with the defendant.

At some point prior to November of 2005, Drs. Raskin and Ebb proposed doing surgery on William's tumor, which at this point had caused a "foot drop," and surgery was scheduled. However, Mrs. Parr continued to research other options and she discussed the possibility of doing RFA treatment with Drs. Ebb and Raskin. Dr. Raskin asked Dr. Rosenthal after one of the weekly meetings about the possibility of using RFA on William. Mrs. Parr testified that Drs. Ebb and Raskin thought RFA was something to consider and referred the Parrs to the defendant, who they said "was the best doctor in the business basically. He was the -- one of the founders of radiofrequency ablation and had worked at Mass. General for a long time." After that, Mrs. Parr discussed with the defendant the possibility of treating

radiation physicians as well. And we will discuss children and adults in those conferences."

William with RFA. These discussions occurred by telephone and through electronic mail messages.[14] Mrs. Parr spoke to at least one other doctor, not affiliated with MGH, about doing the RFA procedure before it was scheduled with the defendant.

On the day of the RFA procedure, Dr. Ebb came into the waiting room to find Mrs. and Mr. Parr after the procedure had been terminated. Dr. Ebb told Mrs. Parr "that there had been a complication during the procedure." Dr. Ebb said the complication was "burn above the tumor site." Mrs. Parr was first made aware that "something had gone wrong" around noon of the day of the RFA. Mr. Parr testified that either Dr. Ebb or Dr. Rosenthal told them that there had been a complication and that they discovered the burn when they moved the surgical drapes. He also testified that he knew it was related to the procedure. Neither the doctors nor anyone else from MGH ever told the Parrs what caused the burn.

Dr. Raskin later spoke to Mrs. Parr, saying that "he was going to admit Will to the hospital." Mrs. Parr was not told the cause of the burn or how serious it was, but her understanding at that time was that William "would recover and be fine . . . my understanding was that he would be okay." Dr.

---

[14] At some point, it was decided to move forward with the RFA. Either Dr. Ebb or Dr. Raskin presented the idea of doing the RFA procedure for William to the tumor board. The surgery that had been scheduled was postponed.

Rosenthal originally described it as a "superficial burn." Dr. Raskin referred to the burn as a "superficial blister" in his notes on the day of the RFA procedure. Mr. Parr testified that after learning of the complication, "we were hopeful it was just something minor that . . . it would heal up and we would move forward and ultimately get home soon." Mr. Parr testified that they did not know how serious the burn was at first and that he "never knew" how bad the burn was.

After being at MGH for a week, William was sent to Spaulding Rehabilitation Hospital (Spaulding) "[b]ecause he still couldn't move he was in so much pain. And he still had a very large, unhealed burn on the back of his knee. He was really very unstable." William was at Spaulding for four to five weeks. Dr. Rosenthal visited William while he was at MGH, and he reviewed William's records and visited him at Spaulding while William was recovering from the burn. Dr. Raskin gave Dr. Rosenthal updates about William's progress because he was entitled to those updates as "part of the team."

When William returned home after being at Spaulding, he received in-home physical therapy, and a visiting nurse provided medical care. The burn did not heal during this process despite efforts throughout the winter that were directed by Dr. Raskin. The burn became infected and William was readmitted to MGH in February of 2006. Dr. Raskin performed debridements of the

burn.  Amputation was considered, and on March 20, 2006, William's leg was amputated below the knee.[15]  The Parrs commenced this medical malpractice action on March 6, 2009, more than three years from the date of the RFA procedure but less than three years from the date of the first amputation.

Jury instructions.  The plaintiff requested that the judge instruct the jury, in relevant part, as follows:

> "Further, the law recognizes that, 'a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith and realistically cannot be expected to question and assess the techniques employed or the manner in which services are rendered,' while he is still being treated for the same injuries.  The law recognizes that it is not reasonable to expect a patient to sue her doctor while she is being treated by him, or doctors with whom he works, while she is being treated by them for the same injury.  The Plaintiff's cause of action does not accrue until treatment for the injuries has been terminated."

The judge denied this request because the doctrine had not been adopted in Massachusetts in the medical malpractice context, and he concluded that even if the rule had been adopted, it did not apply in this factual situation.  The judge instead instructed the jury that the cause of action accrues as follows:

> "The general rule is that a cause of action accrues on the date of the plaintiff's injury; in this case, William's injury.  However, that rule does not apply where the plaintiff did not know or could not reasonably have known of the cause of action. . . . [T]he question comes down to

---

[15] A second amputation was performed above the knee on March 12, 2008.

whether the plaintiffs knew or should have known that William Parr had been harmed to an appreciable or not insignificant extent by Dr. Rosenthal's conduct."

After these instructions, the jury answered "yes" to the special verdict question: "Did the plaintiffs know or should they reasonably have known prior [to] March 6th, 2006, . . . that they had been harmed by the conduct of the defendant?" See note 3, supra.

Standard of review. "We review objections to jury instructions to determine if there was any error, and, if so, whether the error affected the substantial rights of the objecting party." Dos Santos v. Coleta, 465 Mass. 148, 153-154 (2013), quoting from Hopkins v. Medeiros, 48 Mass. App. Ct. 600, 611 (2000).

Discussion. The continuing treatment doctrine would, generally, toll the running of the statute of limitations during treatment for the same or related illness or injury continuing after the alleged act of malpractice but not during the continuation of a general physician-patient relationship by itself. Both parties agree that neither the Supreme Judicial Court nor this court has addressed whether the continuing treatment doctrine tolls the statute of limitations in medical malpractice actions in Massachusetts.

The Supreme Judicial Court has, however, adopted an analogous continuing representation rule that is applicable to

legal malpractice claims. See Murphy v. Smith, 411 Mass. 133, 137 (1991) ("the continuing representation doctrine . . . tolls the statute of limitations in legal malpractice actions where the attorney in question continues to represent the plaintiff's interests in the matter in question"). In Murphy, the court explained that "[t]he doctrine 'recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered.'" Id. at 137, quoting from Cantu v. Saint Paul Cos., 401 Mass. 53, 58 (1987).[16]

The questions at issue here are first, whether the statute of limitations is tolled during the continuing treatment of the patient for the same injury upon which the action for malpractice is based, and second whether, if the patient knew or reasonably should have known of the appreciable harm resulting from the act of malpractice, the statute of limitations would not be tolled by application of the continuing treatment doctrine.

---

[16] The Supreme Judicial Court clarified in Lyons v. Nutt, 436 Mass. 244, 250 (2002), that the continuing representation doctrine was not applicable "where the client actually knows that he suffered appreciable harm as a result of his attorney's conduct" because once "the client has such knowledge, . . . there is no innocent reliance which the continued representation doctrine seeks to protect" (quotation omitted).

As to the first question, we can see no reason why a rule analogous to the continuing representation doctrine should not apply to medical malpractice claims in the limited situation where three years since the harm occurred has elapsed but the seven-year statute of repose[17] has not yet barred the action.[18] The statute of limitations imposed on medical malpractice claims uses almost exactly the same language as is applied to legal malpractice claims.  See G. L. c. 260, § 4, first par., inserted by St. 1981, c. 765 (requiring that legal malpractice claims "shall be commenced only within three years next after the cause of action accrues").  Compare G. L. c. 260, § 4, second par. (requiring that medical malpractice claims "shall be commenced only within three years after the cause of action accrues").  See also Harlfinger v. Martin, 435 Mass. 38, 49 (2001) (explaining that the Supreme Judicial Court extended the same

---

[17] General Laws c. 260, § 4, second par., provides, in addition to the three-year statute of limitations for medical malpractice actions, a seven-year statute of repose:

> "[I]n no event shall any such [malpractice] action be commenced more than seven years after occurrence of the act or omission which is the alleged cause of the injury upon which such action is based except where the action is based upon the leaving of a foreign object in the body."

[18] The Supreme Judicial Court has held that the continuing treatment rule, as it has been recognized in other jurisdictions, would have no effect on the statute of repose because the Massachusetts statute of repose is not subject to any form of tolling.  Rudenauer v. Zafiropoulos, 445 Mass. 353, 357 (2005).

discovery rules that apply to other tort claims to medical

malpractice actions in Franklin v. Albert, 381 Mass. 611, 618-

619 [1980]).  Moreover, the jurisdictions the Supreme Judicial

Court cited to support the adoption of the continuing

representation doctrine for legal malpractice in Massachusetts

have all adopted a version of the continuing treatment doctrine

for medical malpractice cases.[19]

---

[19] See Murphy v. Smith, 411 Mass. at 137 (citing to Louisiana, New York, South Dakota, and Virginia case law); Carter v. Haygood, 892 So. 2d 1261, 1268, 1271-1272 (La. 2005) (holding the prescriptive one-year period for medical malpractice actions can be tolled by continuing treatment, and analogizing to the legal malpractice continuing representation rule); Borgia v. New York, 12 N.Y.2d 151, 155 (1962) ("We hold that at least when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the 'accrual' comes only at the end of the treatment"); Greene v. Greene, 56 N.Y.2d 86, 93-94 (1982) (explaining that the continuing treatment doctrine "was first recognized in personal injury cases involving medical malpractice" but is applicable to other professions, including lawyers); Schoenrock v. Tappe, 419 N.W.2d 197, 197 (S.D. 1988) (cited by the Supreme Judicial Court in Murphy v. Smith, supra, and "extending the continuous treatment doctrine to legal malpractice actions"); Lewis v. Sanford Med. Center, 840 N.W.2d 662, 667-668 (S.D. 2013) (holding the continuing treatment rule in a medical malpractice case was inapplicable based upon the facts presented); Farley v. Goode, 219 Va. 969, 976 (1979) ("We hold under these facts that when malpractice is claimed to have occurred during a continuous and substantially uninterrupted course of examination and treatment in which a particular illness or condition should have been diagnosed in the exercise of reasonable care, the date of injury occurs, the cause of action for that malpractice accrues, and the statute of limitations commences to run when the improper course of examination, and treatment if any, for the particular malady terminates"); Justice v. Natvig, 238 Va. 178, 180 (1989), quoting from Grubbs v. Rawls, 235 Va. 607, 613 (1988) ("[I]f there existed a physician-patient relationship where the patient

The defendant argues that the continuing treatment doctrine, even if adopted, would not apply in this case because Drs. Ebb and Raskin's treatment of William after the RFA procedure cannot be imputed to the defendant. However, whether

was treated for the same or related ailments over a continuous and uninterrupted course, then the plaintiff could wait until the end of that treatment to complain of any negligence which occurred during that treatment. Thus, within the confines of Farley [v. Goode, 219 Va. 969 (1979)], Fenton [v. Danaceau, 220 Va. 1 (1979)], and this opinion, Virginia has a true continuing treatment rule") (emphasis omitted).

New York has codified the continuing treatment rule in medical malpractice cases. See Williamson v. PricewaterhouseCoopers LLP, 9 N.Y.3d 1, 8 (2007) ("The continuous treatment doctrine was first recognized in medical malpractice cases [see Borgia v. City of N.Y., 12 N.Y.2d 151 (1962)], and is codified in CPLR 214-a. The statute provides that an action for medical malpractice must be commenced within 2 1/2 years from the date of the 'act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure'").

Louisiana has since altered its statute concerning legal malpractice to include two peremptive periods and, therefore, tolling by the continuing representation rule is no longer permitted in the context of legal malpractice. See Jenkins v. Starns, 85 So. 3d 612, 626 (La. 2012). However, the medical malpractice period of prescription statute does not include the same language that ended the use of the continuing representation rule in Louisiana for legal malpractice. Compare La. Rev. Stat. Ann. § 9:5628(A) (West 2007) (medical malpractice prescription statute, which makes no mention of "peremptive periods"), with La. Rev. Stat. Ann. § 9:5605(B) (West 2007) (providing that "[t]he one-year and three-year periods of limitation [for legal malpractice actions] provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended").

the continuing treatment by the sarcoma group would be imputed to the defendant presents a factual question for the jury.

The case law in other jurisdictions does not clearly establish a single rule for when treatment by an associated doctor can be imputed to the alleged negligent doctor.  See Tolliver v. United States, 831 F. Supp. 558, 560 (S.D. W. Va. 1993) ("Examination of the cases does not disclose a bright-line rule showing clearly when multiple physicians are to be considered as providing continuous treatment under the rule. The cases discussed herein do make clear that a close nexus is required for a change of doctors not to break the chain"). However, many cases acknowledge that when there is a close relationship between the doctors, or a patient is considered a patient of the group, then subsequent treatment by another doctor may be imputed.[20]  On retrial, if the jury conclude that

---

[20] See, e.g., Otto v. National Inst. of Health, 815 F.2d 985, 988-989 (4th Cir. 1987) (treatment by doctors outside the National Institute of Health [NIH] did not disrupt the continuous treatment by NIH because the "additional treatment was rendered at the advice and under the direction of the NIH physicians, to whom the private doctors consistently and repeatedly deferred"); Taylor v. Phillips, 304 Ark. 285, 286, 289 (1990) (oral surgeon's partner seeing the patient and then consulting with the oral surgeon and advising that more surgery was needed did not disrupt the oral surgeon's continuous treatment of the patient); Offerdahl v. University of Minn. Hosps. & Clinics, 426 N.W.2d 425, 428 (Minn. 1988) ("We hold, under these unique facts where the patient sought treatment from a clinic as a whole rather than an individual physician, the treatment of the clinic as a whole, rather than that of the individual physician alleged to have committed the act of

William was a group patient of all three doctors and not an

individual patient of Drs. Raskin and Ebb, or that the defendant

was still providing input to Drs. Raskin and Ebb on William's

care as part of the group prior to the amputation, then their

continuing treatment for the burn can be imputed to the

defendant.  However, if the jury conclude that the defendant was

_____

malpractice, is relevant for purposes of determining when
treatment terminated and the statute of limitations began to
run"); Watkins v. Fromm, 108 A.D.2d 233, 234 (N.Y. 1985) ("we
conclude that the subsequent treatment by the remaining members
of the medical group may be imputed to the departed physicians
for Statute of Limitations purposes, provided it is established
that the patient was treated as a group patient and the
subsequent treatment was for the original condition and/or
complications resulting from the original condition").  Compare
Grey v. Stamford Health Sys., Inc., 282 Conn. 745, 758 (2007)
(explaining that "the continuous treatment doctrine generally is
inapplicable to providers of isolated and discrete consultative
diagnostic services" for failure to diagnose); Florio v. Cook,
65 A.D.2d 548, 548-549 (N.Y. 1978) (holding that the statute of
limitations had run for a surgeon who performed a thoracic
laminectomy and provided postoperative care because treatment by
the physician he referred care to could not be imputed to the
defendant without a "master-servant or principal-agent
relationship between the two physicians" or a role in the
continued care of the patient); Pierre-Louis v. Ching-Yuan Hwa,
182 A.D.2d 55, 58-59 (N.Y. 1992) ("an agency or other relevant
relationship between the allegedly wrong-doing physician and the
subsequent treating physician" was required; simply working for
the same hospital is not sufficient) (citation omitted);
Liffengren v. Bendt, 612 N.W.2d 629, 634 (S.D. 2000) (continued
treatment by the doctor the patient was referred to for follow-
up care could not be imputed to the defendant doctor without
principal-agent or master-servant relationship, particularly
where the defendant had nothing more to do with patient's care);
Echols v. Keeler, 735 P.2d 730, 732 (Wyo. 1987) (explaining that
continuing care cannot be imputed to the original doctor when
the patient is referred to another doctor and the allegedly
negligent doctor does "not continue as [the patient]'s doctor
nor was he associated with or engaged in assisting the doctors
thereafter treating [the patient]").

simply a specialist who provided discrete care and did not participate in the care of William's burn, then Dr. Raskin's and Dr. Ebb's care cannot be imputed to the defendant. As a result, this is a factual question for the jury to consider. See Mule v. Peloro, 60 A.D.3d 649, 649-650 (N.Y. 2009) (holding that whether the continuing treatment doctrine applied was an issue of fact where the plaintiffs provided evidence their decedent was subsequently treated by other physicians in the same group for the same condition); Green v. Associated Med. Professionals of NY, PLLC, 111 A.D.3d 1430, 1432 (N.Y. 2013).

The answer to the second question, whether the discovery rule limits the application of the continuing treatment doctrine, requires us to choose between a division in our Federal and State jurisdictions regarding the primary reason for applying the continuing treatment doctrine. On the one hand is "the patient's ability to discover the facts surrounding her injury, while she is still being treated by the same doctor who caused the injury in the first place. Courts have stated that it is not reasonable to expect a patient under the continuing care of a doctor to be able to recognize that the doctor's actions may have caused her injuries, because the doctor may conceal information from the plaintiff, and the patient will be reluctant to question her doctor while she is still under the doctor's care." Stephenson v. United States, 147 F. Supp. 2d

1106, 1109 (D. N.M. 2001). The primary reason to apply the doctrine in these jurisdictions is to allow the patient to discover the injury.[21]

On the other hand is the pragmatic recognition that courts want

> "to prevent interference in the doctor-patient relationship, as long as it exists, and want to give the doctor an opportunity to treat and heal any injury the doctor may have caused. As the Ulrich[22] opinion states, some courts feel it is 'absurd' to require the plaintiff to interrupt corrective treatment in order to immediately commence legal proceedings. These opinions emphasize the trust and confidence placed in doctors by their patients. . . . In other words, these courts do not want any disruption of the treatment that could end up healing the patient, thus avoiding a significant problem later and a lawsuit altogether."

Ibid.

If the emphasis is on the question of discovery, the application of a continuing treatment doctrine will only provide some assistance to a plaintiff whose knowledge of the injury and

---

[21] We recognize that some jurisdictions have indicated that the continuing treatment rule is not needed in a jurisdiction that has adopted the discovery rule. See Jones v. McDonald, 631 So. 2d 869, 872 (Ala. 1993), and cases cited. However, we do not find this reasoning persuasive, as the Supreme Judicial Court adopted the continuing representation rule for legal malpractice notwithstanding the fact that the discovery rule already applied. Murphy v. Smith, 411 Mass. at 136-138.

[22] Ulrich v. Veterans Admn. Hosp., 853 F.2d 1078, 1080 (2d Cir. 1988).

the cause of the injury is doubtful.[23]  However, if the focus is on the benefit of encouraging a physician-patient relationship and allowing, if not encouraging, the patient to complete the course of treatment for the injury, it is less relevant whether the patient knows of the injury or of its cause.  Application of the doctrine will toll the statute of limitations so long as the patient remains in continuous treatment for the injury by the same physician or group, or under the general control of that physician or group, subject to the statute of repose.  Maintaining this relationship will benefit the patient by allowing and encouraging proper treatment of the injury.

We recognize that actual knowledge of legal malpractice in Massachusetts typically terminates the application of the continuing representation exception to the statute of limitations accruing at discovery.  See Lyons v. Nutt, 436 Mass. 244, 249-250 (2002).  In adopting this limitation to application of the continuing representation doctrine, the Supreme Judicial Court indicated that once a client has actual knowledge that he

---

[23] In Massachusetts, we have already adopted the discovery rule for the accrual of medical malpractice claims.  See Franklin v. Albert, 381 Mass. at 612 ("a cause of action for medical malpractice does not 'accrue' under G. L. c. 260, § 4, until a patient learns, or reasonably should have learned, that he has been harmed as a result of a defendant's conduct").  As a result, application of this version of the doctrine would not alter a determination that the statute of limitations had passed.  Also, as previously discussed, we adopted the continuing representation rule despite having a discovery rule applicable to such actions.  See note 21, supra.

has suffered appreciable harm, there is no reason to apply the rule because "then there is no innocent reliance which the continu[ing] representation doctrine seeks to protect." Id. at 250 (quotation omitted).

Unlike continuing legal representation, however, in the medical malpractice context there is a compelling reason to continue to protect the physician-patient relationship even after the plaintiff arguably has actual knowledge. The patient could in "good faith . . . know[] that the physician has rendered poor treatment, but continue[] treatment in an effort to allow the physician to correct any consequences of the poor treatment." Harrison v. Valentini, 184 S.W.3d 521, 525 (Ky. 2005). See ibid. (further explaining that the plaintiff must be seeking continued care in good faith). See also Litsey v. Allen, 371 S.W.3d 786, 789 (Ky. Ct. App. 2012) (limiting the situations where the statute of limitations is tolled and the plaintiff has actual knowledge to those situations where there is a showing that the plaintiff is relying on the doctor to "correct the consequences of poor treatment").

Here, the Parrs argue that while they were aware of a "complication" as a result of the RFA, they were led to believe, as the doctors also believed, that the burn was superficial and that William would be fine. The Parrs maintain that they placed their trust and confidence in the treatment plan proposed by

Drs. Ebb and Raskin, specifically, and the sarcoma group generally. We conclude that actual knowledge should not bar application of the continuing treatment doctrine so long as the patient is continuing treatment in good faith and not solely to allow more time to develop their malpractice case.

We will therefore adopt the continuing treatment doctrine as it emphasizes maintenance of the physician-patient relationship.

Conclusion. The statute of limitations shall be tolled on a medical malpractice claim so long as the plaintiff receives continuing treatment for the same injury or illness allegedly caused by the original treating physician, even if the plaintiff knew or should have known of the injury and its cause, subject to the limit of the statute of repose. Whether subsequent care provided by other physicians can be imputed to the original treating physician will be a question for the jury, as will the question whether the patient is continuing treatment in good faith. On the facts presented here, the judge's refusal to instruct the jury on the continuing treatment doctrine was error affecting the plaintiff's substantial rights. We, therefore, reverse the judgment, set aside the verdict, and reverse the order denying the motion for new trial. We remand the case to the Superior Court for a new trial with directions

to the trial judge to instruct the jury in a manner consistent with this opinion.

<u>So ordered</u>.