NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12014

MICHAEL PARR[1] & another[2]  vs.  DANIEL ROSENTHAL.


Essex.     April 5, 2016. - September 2, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.[3]


Limitations, Statute of.  Medical Malpractice, Statute of
limitations.  Negligence, Doctor, Medical malpractice.


Civil action commenced in the Superior Court Department on
March 9, 2009.

The case was tried before Thomas R. Murtaugh, J., and a
motion for a new trial was heard by him.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


Myles W. McDonough (James S. Hamrock, Jr., with him) for
the defendant.
David J. Gallagher for the plaintiffs.

_____

[1] As parent and next friend of William Parr.

[2] Michele Parr, as parent and next friend of William Parr.

[3] Justice Cordy participated in the deliberation on this
case and authored his separate opinion prior to his retirement.
Justices Spina and Duffly participated in the deliberation on
this case prior to their retirements.

Annette Gonthier Kiely, Adam R. Satin, & Thomas R. Murphy, for Massachusetts Academy of Trial Attorneys, amicus curiae, submitted a brief.

John J. Barter, for Professional Liability Foundation, Ltd., amicus curiae, submitted a brief.

GANTS, C.J.  The plaintiffs commenced this medical malpractice action against the defendant in the Superior Court for his alleged negligence in connection with a "radio frequency ablation" (RFA) procedure he performed on the leg of their minor son, which caused severe burning and eventually resulted in the amputation of the child's leg.  The jury did not reach the issue of negligence because they found that, more than three years before the plaintiffs filed the action, they knew or reasonably should have known that the child had been harmed by the defendant's conduct, so the action was barred by the statute of limitations for medical malpractice claims.

The plaintiffs contend that the jury should have been instructed on the so-called "continuing treatment doctrine" applicable to medical malpractice claims, a doctrine that heretofore has not been recognized under Massachusetts law. Generally speaking, the doctrine states that a cause of action does not accrue, and therefore the statute of limitations clock does not begin to run, for medical malpractice claims during the period that an allegedly negligent physician continues to treat the patient for the same or a related condition.  See, e.g.,

Borgia v. New York, 12 N.Y.2d 151, 156-157 (1962).  We now recognize the doctrine under Massachusetts law and hold that the statute of limitations for a medical malpractice claim generally does not begin to run while the plaintiff and the defendant physician continue to have a doctor-patient relationship and the plaintiff continues to receive treatment from the physician for the same or a related condition.  We also hold that the continuing treatment exception to the discovery rule terminates once a patient (or the parent or guardian of a minor patient) learns that the physician's negligence was the cause of his or her injury.  We further hold that, once the allegedly negligent physician no longer has any role in treating the plaintiff, the continuing treatment doctrine does not apply even if the physician had at one time been part of the same "treatment team" as the physicians who continue to provide care.  Here, where the jury found that the plaintiffs knew or reasonably should have known more than three years before commencing suit that they had been harmed by the conduct of the defendant, and where the defendant's participation in treating the plaintiff ended more than three years before the suit was filed, the cause of action accrued more than three years before the action was commenced and therefore was not timely under the statute of limitations. We thus affirm the judgment in favor of the defendant.[4]

---

[4] We acknowledge the amicus briefs submitted by the

    Background.  We recite the facts in the light most favorable to the plaintiffs.  See Lipchitz v. Raytheon Co., 434 Mass. 493, 499 (2001).  William Parr was born on September 3, 1994.[5]  At birth, he had a large lump at the back of his right calf.  Within a few weeks, he was taken by his parents, Michele Parr and Michael Parr, to Massachusetts General Hospital (MGH), where he was referred to the "sarcoma group" for imaging studies and a biopsy.  The sarcoma group is a team of orthopedic surgeons, general surgeons, radiation oncologists, medical oncologists, and others who treat tumors of the connective tissues, including bones, muscles, fat, nerves, and other tissues.  The sarcoma group works on an interdisciplinary model.  The team members meet twice weekly and have "very close interdisciplinary relationships."

    Initially, William's lump was diagnosed by the sarcoma group as a "hamartoma."[6]  By January, 2003, when William was eight years old, the size of the lump had increased, causing

---

Massachusetts Academy of Trial Attorneys and the Professional Liability Foundation, Ltd.

    [5] Because the child and his parents have the same last name, we refer to each by his or her first name.

    [6] A "hamartoma" is a benign tumor-like malformation resulting from faulty development in an organ and composed of an abnormal mixture of tissue elements that develop and grow at the same rate as normal elements but are not likely to compress adjacent tissue.  See Stedman's Medical Dictionary 849 (28th ed. 2006).

William occasionally to limp. At that time, Dr. Mark Gebhardt, a member of the sarcoma group at MGH, performed a biopsy in which he removed pieces of the lump for the pathologist to examine. Gebhardt determined that the lump was engulfing much of William's calf muscle and was having an impact on his nerves and blood vessels. At this time, it was determined that the lump was a "desmoid tumor." Desmoid tumors are relatively rare, benign tumors but can grow in such a way as to infiltrate normal tissue and impair bodily functions.

Soon after the biopsy, Gebhardt left MGH. William's care was assumed by Dr. David Ebb, a pediatric oncologist, and Dr. Kevin Raskin, an orthopedic surgeon, both of whom were on the staff at MGH and were members of the sarcoma group. At some point prior to November, 2005, Raskin and Ebb proposed and scheduled a surgery on William's tumor, which at this point had caused abnormality in his gait. Meanwhile, Michele continued to research other options, and she discussed the possibility of RFA treatment with Ebb and Raskin.[7] After one of the meetings of the

---

[7] Radio frequency ablation (RFA) involves the insertion of a long probe with expandable heating tines that generate high frequency electrical current to burn or "cook" the target, here the tumor. There are a number of limitations to the procedure: (1) the "ablation" or burn zone is constrained by the size of the device used and the blood flow to the area, limiting the ablation to the spherical area immediately surrounding the tines; (2) the RFA procedure does not distinguish between a targeted tumor and other healthy, critical structures -- it burns everything in its reach; and (3) it is impossible to

sarcoma group, Raskin and Ebb approached the defendant, Dr. Daniel Rosenthal, about the possibility of performing RFA on William's desmoid tumor. Rosenthal was a board certified radiologist on the staff at MGH and had been a member of the sarcoma group since 1978. He "invented" RFA, meaning that he was the first physician to use RFA to treat a tumor, and was a recognized leader in the field.[8] Through the sarcoma group, he was generally familiar with William's case. Raskin and Ebb then put Michele in touch with Rosenthal. They told Michele that Rosenthal "was the best doctor in the business basically. He was . . . one of the founders of radiofrequency ablation and had worked at [MGH] for a long time." Rosenthal eventually agreed

---

predict precisely the extent of the zone of ablation. The procedure involves the use of a tourniquet to limit the blood flow into the area of the procedure.

[8] Dr. David Ebb testified that he and Dr. Kevin Raskin "regularly worked with [Dr. Daniel Rosenthal] in the context of [their] delivering care to patients . . . and were both well aware that Dr. Rosenthal had been one of the pioneers in applying this technique . . . and felt that he was the best resource [they] had with whom to confer regarding this option in [William's] case." Raskin testified that, when Michele first inquired about the possibility of treating William with RFA, he told her, in effect, "[I]t turns out we have . . . the world's expert here at MGH who does radiofrequency ablation and maybe we can come up with a plan to use radiofrequency ablation to treat this tumor." Raskin further testified that he knew Rosenthal "as part of [their] group at MGH." He continued, "[W]e have . . . very close interdisciplinary relationships. I mean, I can't function as an orthopedic oncologist without . . . Dr. Rosenthal, the radiology group helping me interpret imaging, or the pathologists helping me interpret slides." He described his relationship with Rosenthal and the group as a "very close, very active relationship."

to perform the procedure and it was presented and approved at subsequent sarcoma group meetings. Rosenthal had never performed RFA on a desmoid tumor before performing the procedure on William, and as of the date of trial had not performed another RFA on a desmoid tumor.

Prior to the procedure, Rosenthal told Michele that the procedure was reasonable and could help William. Michele testified that Rosenthal told her that RFA could "kill" the tumor, but he did not explain any risks of the procedure. Rosenthal said the procedure would be a day surgery, that William would come out with "band-aids" at the sites where the probe had gone in, and that he would be home by the afternoon.

Michael brought William to MGH on the morning of November 4, 2005, for the RFA procedure, and Michele arrived soon thereafter. Rosenthal briefly showed Michael and William a drawing describing the procedure, demonstrating the location of the tumor and other areas he was going to treat. Michael signed a consent form, which listed the risks of the procedure, including bleeding, infection, nerve damage, and failure to cure. The form did not disclose any risk of burns to the skin, blood vessels, or other vital structures. Moreover, the risks associated with the use of a tourniquet were not mentioned.

Rosenthal completed the first three of his planned four ablations when he noticed what he described as "superficial skin

blisters" in the area behind William's knee. At that point, despite not having completed all of the planned ablations, Rosenthal realized that he had already burned more than the entire planned treatment area. On seeing the burned area behind William's knee, Rosenthal then stopped the procedure and called two other sarcoma group members, Ebb and Raskin, to the operating room. A decision was made to discontinue the procedure.

Ebb explained to Michael and Michele that there had been a complication during the procedure, and that William had suffered a burn above the tumor site. Michele testified that she was not told the cause of the burn or how serious it was, but was told that William "would recover and be fine." Michael testified that he and Michele did not know how serious the burn was at first and that he "never knew" how bad the burn was. Rosenthal originally described it to them as a "superficial burn." Raskin referred to the burn as a "superficial blister" in his notes on the day of the RFA procedure.

William was admitted to MGH for one week after the RFA procedure and was then transferred to Spaulding Rehabilitation Hospital (Spaulding) for an additional five weeks. Rosenthal visited William every day during his week-long stay at MGH and several more times at Spaulding. Rosenthal's last note in William's medical file, made during a visit on November 7, 2005,

states that there was "clear improvement in his nerve function." In fact, by that time, the nerves had been irreparably damaged from the burn. The burned area ultimately grew to full thickness, creating a very foul smelling, necrotic blackened hole in the back of William's knee that spanned the entire area of the knee from medial to lateral. The nerves were destroyed.

When William returned home from Spaulding, he received in-home physical therapy, and a visiting nurse provided medical care. He also continued to receive care from the sarcoma group. The burn did not heal during this period despite efforts throughout the winter that were directed by Raskin. The burn eventually became infected, and William was readmitted to MGH in February, 2006. Raskin performed debridements of the burn. On March 19, 2006, after the seventh debridement, it became clear that William's leg could not be saved, and his parents were told that amputation below the knee was necessary. On March 20, 2006, William's leg was amputated below the knee.

About two years later, a second amputation, this one above the knee, became necessary because of continued infections, and because there was insufficient muscle preserved to enable use of a prosthesis or to make the knee functional. Thus, on March 12, 2008, Raskin performed an amputation above the knee on William's right leg. According to Rosenthal's testimony at trial, the need for the amputations was a direct result of the complication

that occurred during the RFA procedure.  Neither Ebb, Raskin, nor Rosenthal at any time described to the Parrs what had caused the burn and the resulting injuries.  Michael was told that it was simply an "anomaly."  The Parrs did not know what had happened, despite asking repeatedly.  As Michael testified, "We trusted them, we worked with them and we did not know."

Michele and Michael, as parents and next friends of William, filed a civil complaint in the Superior Court on March 9, 2009, alleging malpractice by Rosenthal with respect to the RFA procedure performed by him on November 4, 2005.[9]  The case proceeded to a jury trial.  Because, under G. L. c. 231, § 60D, a medical malpractice action brought on behalf of a minor who is at least six years old must "be commenced within three years from the date the cause of action accrues," the defendant argued that he was entitled to judgment because the action was not timely filed.  At the charge conference and in his proposed jury instructions, the plaintiffs' counsel argued that the statute of limitations was tolled while William's treatment was continuing.  Relying on the continuing treatment doctrine, he argued that a cause of action for medical malpractice does not accrue until

---

[9] The action was brought solely on behalf of William; neither Michele nor Michael claimed loss of consortium.

treatment of a plaintiff by a defendant doctor, or doctors with whom he works, has terminated.[10]

The judge declined to give such an instruction. He correctly stated that Massachusetts had not yet recognized the continuing treatment doctrine. He further stated that he "would suggest" that Massachusetts would not "adopt that theory," and that, in any event, the doctrine would not apply to the facts of this case. The judge said the defendant "rendered a very specific treatment" and "[t]hat was it"; "[h]e was not involved in the treatment of William after that." In response to counsel's argument that the cause of action did not accrue while the plaintiff was being treated by the "treatment team" of which the defendant was a member, the judge noted that no Massachusetts case had taken that position in a medical malpractice case.

---

[10] The jury instruction proposed by the plaintiffs, which quoted the legal malpractice case of Murphy v. Smith, 411 Mass. 133, 137 (1991), quoting Greene v. Greene, 56 N.Y.2d 86, 94 (1982), stated:

"Further, the law recognizes that, 'a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith and realistically cannot be expected to question and assess the techniques employed or the manner in which services are rendered,' while he is still being treated for the same injuries. The law recognizes that it is not reasonable to expect a patient to sue her doctor while she is being treated by him, or doctors with whom he works, while she is being treated by them for the same injury. The [p]laintiff's cause of action does not accrue until treatment for the injuries has been terminated." (Footnotes omitted.)

As to the question whether the claim was timely brought within the statute of limitations, the judge instructed the jury as follows:

> "Ordinarily a personal injury claim must be brought within three years of the date the cause of action accrues or arises.  Here, this case was commenced on March 6, 2009.[11]  The question is whether the claim was brought within three years after the date on which the cause of action arose.  The general rule is that a cause of action accrues on the date of the plaintiff's injury[,] in this case, William's injury.  However, that rule does not apply where the plaintiff did not know or could not reasonably have known of the cause of action. . . . [T]he question comes down to whether the plaintiffs knew or should have known that William Parr had been harmed to an appreciable or not insignificant extent by Dr. Rosenthal's conduct."

The judge also explained the meaning of "should have known" in this context:

> "An action for medical malpractice accrues when a reasonably prudent person in the plaintiff's position reacting to any suspicious circumstances for which they might have been aware should have discovered that his medical care given by the physician may have caused . . . William appreciable or not insignificant injury or harm.  Certainty of causation is not required.  Rather, notice of likely cause is sufficient to start the statute running[,] imposing on the potential litigant the duty to discover from legal, scientific and medical communities whether a theory of causation supports a legal claim."

---

[11] The complaint was actually filed on March 9, 2009, but no counsel objected to the reference to March 6.        [12] The limitation and repose periods for medical malpractice claims brought on behalf of adults, established by G. L. c. 260, § 4, are essentially identical.  Section 4 provides in relevant part:

Plaintiffs' counsel timely objected to the judge's decision not to give a continuing treatment instruction regarding the statute of limitations.

The jury answered "yes" to the first special verdict question:  "Did the plaintiffs know or should they reasonably have known prior [to] March 6th, 2006, that they had been . . . harmed by the conduct of the defendant?"  Because they answered "yes" to this question, they did not reach the other questions, including whether the defendant was negligent and, if so, whether his negligence was a substantial contributing factor in causing William's injury.  Judgment entered for the defendant. The plaintiffs moved for a new trial, claiming that the judge erred by failing to furnish the jury with the continuing treatment instruction.  The judge denied the motion.  The plaintiffs appealed from the judge's decision not to give the continuing treatment instruction, and from the denial of their motion for a new trial.

The Appeals Court reversed the judgment and remanded the case for a new trial.  Parr v. Rosenthal, 87 Mass. App. Ct. 787 (2015).  Relying by analogy on this court's adoption of the "continuing representation" doctrine in legal malpractice cases, see, e.g., Murphy v. Smith, 411 Mass. 133, 137 (1991), the Appeals Court recognized the "continuing treatment" doctrine in medical malpractice cases.  The court held that the limitations

period does not begin to run during the continuing treatment of a patient for the same injury on which the action for medical malpractice is based. See Parr, supra at 788, 792-793. The court also declared that the continuing treatment doctrine "will toll the statute of limitations so long as the patient remains in continuous treatment for the injury by the same physician or group, or under the general control of that physician or group, subject to the statute of repose." Id. at 797.

In cases alleging legal malpractice, the statute of limitations, although tolled under the continuing representation doctrine, nevertheless begins to run once a client acquires actual knowledge that he or she has suffered appreciable harm as a result of the attorney's conduct. See, e.g., Lyons v. Nutt, 436 Mass. 244, 249-250 (2002). The Appeals Court, however, held that in medical malpractice cases "actual knowledge should not bar application of the continuing treatment doctrine so long as the patient is continuing treatment in good faith and not solely to allow more time to develop their malpractice case." Parr, supra at 798. We granted the defendant's application for further appellate review.

Discussion. To state a claim for medical malpractice, a plaintiff must demonstrate that (1) the plaintiff suffered harm; (2) the harm was caused by the defendant physician's conduct; and (3) the defendant physician was negligent, which in medical

malpractice cases means that the physician committed a breach of the "standard of care and skill of the average member of the profession" practicing in his or her specialty. See Bradford v. Baystate Med. Ctr., 415 Mass. 202, 206-208 (1993), quoting Brune v. Belinkoff, 354 Mass. 102, 109 (1968). Where a defendant raises the statute of limitations as an affirmative defense, the plaintiff also bears the burden of proving that the action was timely commenced. See Franklin v. Albert, 381 Mass. 611, 619 (1980). The limitation and repose periods for medical malpractice claims brought on behalf of minors over the age of six are established by G. L. c. 231, § 60D, which provides in relevant part:

> "[A]ny claim by a minor against a health care provider stemming from professional services or health care rendered, whether in contract or tort, based on an alleged act, omission or neglect shall be commenced within three years from the date the cause of action accrues . . . , but in no event shall such action be commenced more than seven years after occurrence of the act or omission which is the alleged cause of the injury upon which such action is based except where the action is based upon the leaving of a foreign object in the body."[12]

---

[12] The limitation and repose periods for medical malpractice claims brought on behalf of adults, established by G. L. c. 260, § 4, are essentially identical. Section 4 provides in relevant part:

> "Actions of contract or tort for malpractice, error or mistake against physicians [and] surgeons . . . shall be commenced only within three years after the cause of action accrues, but in no event shall any such action be commenced more than seven years after occurrence of the act or omission which is the alleged

The statute of repose is not at issue in this case.  The plaintiffs' claim clearly was brought within seven years of William's RFA treatment.  The defendant does not claim otherwise.  The key question is whether the claim was timely brought within the statute of limitations, i.e., within three years of when the cause of action accrued.

A statute of limitations typically prescribes the time period when an action must be commenced after the cause of action "accrues."  The statute sets the limitations period, but in the absence of explicit legislative direction, it is our common law that determines when a cause of action accrues, and hence when the limitations period actually begins to run.  See Franklin, 381 Mass. at 617 ("Absent explicit legislative direction, the determination of when a cause of action accrues, causing the statute of limitations to run, has long been the product of judicial interpretation in this Commonwealth").  In Franklin, supra at 619, we held that the discovery rule applies to the statute of limitations for medical malpractice claims.[13]

_____

cause of the injury upon which such action is based except where the action is based upon the leaving of a foreign object in the body."

[13] By the time we decided Franklin v. Albert, 381 Mass. 611, 619 (1980), we had already applied the discovery rule to other causes of action.  See, e.g., Friedman v. Jablonski, 371 Mass. 482, 485 (1976) (fraudulent misrepresentations in sale of real estate); Hendrickson v. Sears, 365 Mass. 83, 83-84 (1974) (legal malpractice).

Under the discovery rule, medical malpractice claims "accrue" "when the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct." Id. "In determining whether a party has sufficient notice of causation, our inquiry is whether, based on the information available to the plaintiff, a reasonably prudent person in the plaintiff's position should have discovered the cause of his or her injuries." Lindsay v. Romano, 427 Mass. 771, 774 (1998), quoting McGuinness v. Cotter, 412 Mass. 617, 628 (1992). "We do not require that a plaintiff have notice of a breach of a duty before a cause of action may accrue . . . ." Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990). See Lindsay, supra ("It is not necessary that the plaintiff have notice that the defendant was actually responsible for the injury, only that she have knowledge or sufficient notice that the medical care given by the defendant may have caused the injury"). In essence, under our common law, once a patient knows or reasonably should know that he or she has suffered harm and that the harm was caused by the physician's conduct, the statute of limitations clock starts to run, and the patient then has three years to discover whether the physician committed a breach of the standard of care and whether the theory of causation is supported by the evidence, and, if so, to commence a civil suit. See Bowen, supra at 208, quoting Fidler v. Eastman Kodak Co., 714 F.2d 192, 199 (1st Cir.

1983) ("Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim").

1. Continuing treatment doctrine. The plaintiffs argue that Massachusetts should recognize the continuing treatment doctrine, which provides that a cause of action does not accrue while the patient is continuing to receive treatment for the same or related injury or illness from the same physician who allegedly caused the patient harm. See Otto v. National Inst. of Health, 815 F.2d 985, 988 (4th Cir. 1987), and cases cited (in claims brought under Federal Tort Claims Act, "where there has been a course of continuous medical treatment, a claim may not accrue until the end of that course of treatment, if the treatment has been for the same illness or injury out of which the claim for medical malpractice arose"). See also Borgia, 12 N.Y.2d at 155-156. The rationale for the doctrine appears to be two-fold. First, a patient who continues a physician-patient relationship impliedly continues to have trust and confidence in the physician, and this trust and confidence put "the patient at a disadvantage to question the doctor's techniques," Barrella v. Richmond Mem. Hosp., 88 A.D.2d 379, 384 (N.Y. 1982), and impair "the patient's ability to make an informed judgment as to negligent treatment." Harrison v. Valentini, 184 S.W.3d 521,

525 (Ky. 2005). See Otto, supra ("The continuous treatment doctrine is based on a patient's right to place trust and confidence in his physician. . . . [T]he patient is excused from challenging the quality of care being rendered until the confidential relationship terminates"). Second, where there is a poor medical result from a physician's treatment or procedure, a patient is entitled to allow the physician an adequate opportunity to remedy or mitigate the poor result without needing to risk interruption of that course of treatment by exploring whether the poor result arose from that physician's negligence. See id. ("the doctrine permits a wronged patient to benefit from his physician's corrective efforts without the disruption of a malpractice action"); Barrella, supra (patient is entitled "to rely upon the doctor's professional skill without the necessity of interrupting a continuing course of treatment by instituting suit").

In Murphy v. Smith, 411 Mass. 133, 137 (1991), we adopted an analogous "continuing representation" rule for legal malpractice claims. The plaintiffs in that case had received a letter from their neighbors' attorney in 1983, informing them that they did not have good title to property they had purchased. Id. at 135. The plaintiffs then contacted the defendant, the bank's attorney who had certified good record title when they purchased the property. Id. The defendant

assured them that the letter "did not present a cause for concern and that he would take care of it." Id. at 137. The court determined that the defendant's legal representation of the plaintiffs began with this assurance, and ended in 1985, when they retained a new attorney. Id. at 135, 137. They commenced a legal malpractice action against the defendant in 1987. Id. at 135. If the discovery rule applied without exception, the three-year statute of limitations would have begun to run at the time the plaintiffs received the letter from their neighbors' attorney, i.e., when they were put on notice of the alleged defect in their title, and their malpractice claim against the defendant would have been time barred.

The court in Murphy adopted the continuing representation doctrine as an exception to the discovery rule, holding that the doctrine "tolls the statute of limitations in legal malpractice actions where the attorney in question continues to represent the plaintiff's interests in the matter in question." Id. at 137. The statute of limitations in that case thus did not begin to run until 1985, when the defendant's representation of the plaintiffs ended. The continuing representation doctrine "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the

services are rendered."  Id., quoting Cantu v. Saint Paul Cos.,

401 Mass. 53, 58 (1987).

The reasoning we embraced in Murphy, supra, in adopting the

continuing representation exception to the discovery rule in

legal malpractice claims also justifies the adoption of a

continuing treatment exception to the discovery rule in medical

malpractice claims.  Under the discovery rule, we ordinarily

start the clock when the patient knows or has reason to know

that he or she has been harmed by the physician's conduct; we

consider such knowledge or reason to know sufficient to trigger

the patient's "duty to discover" within the three-year

limitations period whether the physician committed a breach of

the standard of care and was the legal cause of the patient's

injury.  See Bowen, 408 Mass. at 208-210.  However, while that

physician continues to treat the patient for the same or related

injury or illness, the physician's patient, like an attorney's

client, "realistically cannot be expected to question and assess

the techniques employed or the manner in which the services are

rendered."  Murphy, supra at 137.  Just as we recognize that a

represented party is entitled to retain confidence in his or her

legal counsel's "ability and good faith" while the

representation continues, so, too, do we recognize that a

patient is entitled to retain confidence in his or her

physician's ability and good faith while continuing treatment

with that physician.  The legal client is disadvantaged in learning whether his or her attorney has committed a breach of the standard of care while that attorney continues to represent the client, and so, too, is a patient disadvantaged in learning whether a physician has committed a breach of the standard of care while the physician continues to treat the patient.  And just as a wronged client is permitted to benefit from his or her attorney's efforts to correct a problem without the disruption of exploring the viability of a legal malpractice action, so, too, is a patient permitted that same benefit without the disruption of exploring the viability of a medical malpractice action.

Moreover, there is no "explicit legislative direction" that precludes us from recognizing a continuing treatment exception in determining when a medical malpractice cause of action accrues.  See Franklin, 381 Mass. at 617.  As the Appeals Court correctly noted, the Legislature used almost identical language to describe the limitations period for medical malpractice claims and for legal malpractice claims.  See Parr, 87 Mass. App. Ct. at 793.  Compare G. L. c. 231, § 60D (medical malpractice claim by minor who is at least six years old "shall be commenced within three years from the date the cause of action accrues"), and G. L. c. 260, § 4, second par. (medical malpractice claim by adult "shall be commenced only within three

years after the cause of action accrues"), with G. L. c. 260, § 4, first par. (legal malpractice claim "shall be commenced only within three years next after the cause of action accrues"). See generally Harlfinger v. Martin, 435 Mass. 38, 49 (2001) (noting that discovery rule principles applicable to other types of tort claims also applied to medical malpractice claims). The only differences in the language of the statutes are slight and insignificant. Given the nearly identical wording of the provisions, there is no reason to conclude that our interpretation of when a cause of action "accrues" in legal malpractice cases should not have its analog in medical malpractice claims.

The defendant argues that the adoption of the continuing treatment doctrine would constitute "improper judicial legislation," urging us to infer from the absence of legislation on the doctrine that the Legislature has rejected it. The defendant points to nothing in the record of the Legislature, however, that suggests that its silence on the subject reflects a conscious choice to reject the continuing treatment doctrine. We decline to interpret the absence of legislative action as an affirmative rejection of the doctrine that bars us from adopting the continuing treatment doctrine as a common-law interpretation

of when a cause of action "accrues" in a medical malpractice case.[14]

Our adoption of the continuing treatment doctrine does not affect the statute of repose that applies to medical malpractice claims, which provides that "in no event shall such action be commenced more than seven years after occurrence of the act or omission which is the alleged cause of the injury upon which such action is based except where the action is based upon the leaving of a foreign object in the body."  G. L. c. 231, § 60D. The effect of a statute of repose "is to place an absolute time limit on the liability of those within [its] protection and to abolish a plaintiff's cause of action thereafter, even if the plaintiff's injury does not occur, or is not discovered, until after the statute's time limit has expired" (citation omitted). Rudenauer v. Zafiropoulos, 445 Mass. 353, 357 (2005).

---

[14] The defendant has not identified any proposed bill to create a continuing treatment exception to the discovery rule in medical malpractice cases that the Legislature failed to enact. But even if the Legislature had, we would not necessarily interpret its failure to enact such legislation as demonstrating an affirmative legislative rejection of such an exception.  In Franklin v. Albert, 381 Mass. 611, 617 (1980), we noted that several bills that would have amended G. L. c. 260, § 4, to include a discovery rule had been proposed and rejected by the Legislature, but we declined to "read the failure to enact these bills as necessarily disapproving, in principle, a discovery rule."  We recognized that, "[t]he practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation."  Id. at 615-616, quoting Berry v. Branner, 245 Or. 307, 311 (1966).

Therefore, in this case, the plaintiffs' cause of action would have been barred by the statute of repose had it been brought more than seven years after November 4, 2005, the date of the RFA procedure, even if the cause of action had yet to accrue under the continuing treatment doctrine.[15,16]

---

[15] The defendant contends, in a single short paragraph at the end of his brief, that if we adopt the continuing treatment doctrine we should only do so prospectively because it would be "a drastic change" in the current law on accrual of causes of action. Assuming that this constitutes adequate appellate argument, we disagree. As the foregoing discussion shows, the continuing treatment doctrine in medical malpractice cases is a logical and foreseeable application of the same basic principles that underlie the continuing representation doctrine in legal malpractice cases, which has been in effect at least twenty-five years. See Murphy, 411 Mass. at 137. There is nothing "drastic" or radically new about it.

[16] The dissent claims that our recognition of the continuing treatment doctrine "intrudes into a critically important sphere of health care policymaking and makes [our] own preferred policy judgment without any inkling of the effect it might have on the cost of health care in Massachusetts, a matter of acute concern to the executive and legislative branches of government." Post at    . This criticism rests on three fallacies. First, the dissent assumes that the continuing treatment doctrine will dramatically increase the cost of health care by significantly increasing the cost of medical malpractice insurance to health care professionals. Some perspective is in order. The continuing treatment doctrine will permit adjudication on the merits of medical malpractice claims that were filed more than three years after a plaintiff learned, or reasonably should have learned, that he or she has been harmed by a physician's conduct, but fewer than seven years after the occurrence of the allegedly negligent act, where the patient continues to be treated for the same or related condition by the allegedly negligent physician. There is no reason to believe, let alone adequate factual information in the record to support a belief, that adoption of the doctrine will affect enough claims to have any meaningful impact on the cost of medical malpractice insurance.

2. <u>Effect of actual knowledge on continuing treatment doctrine</u>. In <u>Lyons</u> v. <u>Nutt</u>, 436 Mass. 244, 250 (2002), we held that the continuing representation exception to the discovery rule in a legal malpractice case terminates once "the client actually knows that he suffered appreciable harm as a result of his attorney's conduct." We reasoned that once "the client has such knowledge, then there is no 'innocent reliance which the continued representation doctrine seeks to protect.'" <u>Id</u>., quoting <u>Cantu</u>, 401 Mass. at 58. The defendant urges us to apply

---

Second, the dissent assumes, without any factual basis, that the Legislature prefers that the few patients who would be affected by the continuing treatment doctrine should be denied the opportunity to receive any compensation for their physician's negligence in order to avoid the remote possibility that adoption of the continuing treatment doctrine would significantly affect the cost of medical malpractice insurance.

Third, although the Legislature has consistently remained silent as to when a cause of action accrues, leaving that to be determined by the courts under the common law, and although the dissent recognizes that we made clear in <u>Franklin</u>, 381 Mass. at 617, that "[a]bsent explicit legislative direction, the determination of when a cause of action accrues, causing the statute of limitations to run, has long been the product of judicial interpretation in this Commonwealth," the dissent assumes that we can and should infer from the Legislature's silence that it has made a "policy judgment" to reject the continuing treatment doctrine. To adopt the dissent's inference from silence would contradict this statement in <u>Franklin</u> and invite all the confusion that arises from an inference based on legislative silence. Moreover, if any inference is to be made from silence, we can infer from the absence of "explicit legislative direction" as to when a cause of action accrues that the Legislature has been content to leave this matter to judicial interpretation, and has instead barred older claims only through enactment of a statute of repose.

an analogous rule for the continuing treatment exception in medical malpractice cases.

In deciding whether to adopt this "actual knowledge" rule, we first consider the logic and purpose behind it.  We declared in Lyons, 436 Mass. at 247, quoting Williams v. Ely, 423 Mass. 467, 473 (1996), that "[t]he statute of limitations applicable to a legal malpractice claim begins to run when a client 'knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's conduct.' . . . This is the so-called discovery rule."  The consequence of the termination rule in Lyons is that, even where the client continues to be represented by the attorney, the statute of limitations clock for legal malpractice claims begins when a client actually knows that he or she has sustained appreciable harm as a result of the lawyer's conduct.  If a client reasonably should know that the attorney has caused the client appreciable harm, but does not actually know it, the continuing representation rule continues to apply.

However, in the practice of law, actual knowledge that an attorney caused a client appreciable harm generally means actual knowledge that the attorney committed legal malpractice. Indeed, in Lyons, 436 Mass. at 247-248, 251, we affirmed the judge's ruling that the continuing representation exception did not apply after the client realized that his law firm "didn't

know what they were doing" once the offeror "walked away from the deal." See <u>Hendrickson</u> v. <u>Sears</u>, 365 Mass. 83, 91 (1974) ("A client's cause of action against an attorney for negligent certification of title to real estate does not 'accrue' . . . until the misrepresentation is discovered or should reasonably have been discovered, whichever first occurs . . .").

But with medical malpractice, a patient's actual knowledge that the physician has caused the patient appreciable harm does not necessarily mean that the patient knows that the physician was negligent, because every medical procedure carries with it a risk of complications that may occur naturally without any breach of the standard of care by the physician. The instant case is a classic example: there was no question that the defendant's RFA procedure caused appreciable harm to William, but actual knowledge of that fact shed little light on whether the harm arose from a mere complication or from the defendant's breach of the standard of care. Therefore, in contrast with an attorney's client, it is simply incorrect to say that, once a physician's patient knows that the physician has caused the patient appreciable harm, there can be no "innocent reliance" that the continuing treatment doctrine seeks to protect. A patient who continues under the care of the same physician will still have the same challenges in learning whether the harm the patient suffered from the physician's treatment arose from the

physician's negligence.  Thus, we conclude that the continuing treatment exception to the discovery rule terminates only when the plaintiff has actual knowledge that his or her treating physician's negligence has caused the patient's appreciable harm, because it is only then that there can no longer be the kind of "innocent reliance" that the continuing treatment doctrine seeks to protect.  Once a patient learns that the physician's negligence was the cause of his or her injury, the patient has acquired sufficient information to initiate litigation, and there is no longer adequate reason to continue to toll the statute of limitations.[17]

---

[17] The Appeals Court held that the continuing treatment doctrine does not end, and continues to apply, even if the patient becomes aware of the physician's negligence, stating that there is a "compelling reason to continue to protect the physician-patient relationship even after the plaintiff arguably has actual knowledge.  The patient could in 'good faith . . . know[] that the physician has rendered poor treatment, but continue[] treatment in an effort to allow the physician to correct any consequences of the poor treatment.'"  Parr v. Rosenthal, 87 Mass. App. Ct. 787, 798 (2015), quoting Harrison v. Valentini, 184 S.W.3d 521, 525 (Ky. 2005).  We decline to place so great an emphasis on the protection of the physician-patient relationship once the patient has actually learned of the physician's negligence.  Where a physician has acted negligently in the patient's treatment, the benefit of promoting the continuation of that relationship is questionable.  Faced with the prospect of the patient suing for malpractice, the physician has competing interests -- on one hand to see that the patient gets the best treatment, and on the other hand to protect his or her own interest by avoiding exposure to liability.  While there may be circumstances where the physician's unique familiarity with the patient's medical history enables the physician to treat the patient's condition most effectively, there may well be others where the physician's

To be clear, by declaring that the tolling of the statute of limitations ends under the continuing treatment doctrine only when a plaintiff obtains actual knowledge of a physician's negligence, we are not revising the discovery rule in medical malpractice. Where the continuing treatment doctrine does not apply, the statute of limitations clock begins to run on a medical malpractice claim when the plaintiff learns, or reasonably should have learned, that he or she has been harmed by the defendant's conduct. Franklin, 381 Mass. at 619. Where the continuing treatment doctrine does apply and, but for the application of the doctrine the statute of limitations clock would have started under the discovery rule, the tolling arising from the doctrine ends once the plaintiff has actual knowledge that the physician's negligence was the cause of his or her injury.

3. Applicability of continuing treatment doctrine during treatment by physicians other than the defendant. In this case, there is no evidence that Rosenthal continued to treat William at any point after William returned home from Spaulding in December, 2005. If the continuing treatment doctrine applies to Rosenthal's treatment only, then the doctrine would not toll the statute of limitations period long enough to render the

---

negligence is indicative of inferior knowledge or skill that will continue to adversely affect the patient's recovery.

plaintiffs' action timely.  The question becomes whether the doctrine continued to apply, and continued to toll the statute of limitations for a claim against Rosenthal, for the additional period that Raskin and Ebb treated William thereafter, as they continued to try to remedy the damage done during the RFA procedure.

The plaintiffs in their proposed jury instruction claimed that the continuing treatment doctrine applies during the ongoing treatment by a defendant physician "or doctors with whom he works."  See note 8, supra.  On appeal, the plaintiffs contend that it applies to medical personnel who were (1) in some "relevant association with the [initial treating] physician," Kelly v. State, 110 A.D.2d 1062, 1063 (N.Y. 1985) (Hancock, J.P., dissenting); or (2) "part of the same team," Tausch v. Riverview Health Inst. L.L.C., 187 Ohio App. 3d 173, 182 (2010).  The Appeals Court recognized that "[t]he case law in other jurisdictions does not clearly establish a single rule for when treatment by an associated doctor can be imputed to the alleged negligent doctor." Parr, 87 Mass. App. Ct. at 794, citing Tolliver v. United States, 831 F. Supp. 558, 560 (S.D. W. Va. 1993).  See Parr, supra at 795 n.20, and cases cited.  The court adopted a variation of the plaintiffs' argument and held that, "[o]n retrial, if the jury conclude that William was a group patient of all three doctors and not an individual patient

of Drs. Raskin and Ebb, or that the defendant was still providing input to Drs. Raskin and Ebb on William's care as part of the group prior to the amputation, then their continuing treatment for the burn can be imputed to the defendant."  Id. at 795-796.

We agree that the continuing treatment doctrine would apply where an allegedly negligent physician continues to supervise, advise, or consult with other physicians who are treating the patient for the same or a related injury.  See Otto, 815 F.2d at 989 (in medical malpractice case where National Institute of Health [NIH] was sole defendant, continuing treatment doctrine applied where "additional treatment was rendered at the advice and under the direction of the NIH physicians"); Stephenson v. United States, 147 F. Supp. 2d 1106, 1112 (D.N.M. 2001) (continuing treatment doctrine applied where negligent primary care physician had "continued direct involvement in evaluating [the patient]'s progress" and exercised "control over the treatment of [the patient] by the other health-care providers"); Echols v. Keeler, 735 P.2d 730, 732 (Wyo. 1987) (continuing care doctrine did not apply where allegedly negligent doctor did "not continue as [the patient's] doctor nor was he associated with or engaged in assisting the doctors thereafter treating [the patient]").  There was no evidence here, however, that after December, 2005, Rosenthal supervised the treatment of William,

or advised or consulted with Raskin and Ebb regarding their treatment of him. Consequently, for the plaintiffs' medical malpractice cause of action to be timely, the continuing treatment doctrine would need to apply to the period following the surgery in which William was being treated by Raskin and Ebb alone.

We need not determine here whether to follow the case law in other jurisdictions that have applied the continuing treatment doctrine to the continuing care of other physicians in the same medical group partnership or medical clinic where a patient is considered by the physicians and the patient to be a patient of the group or clinic rather than of an individual physician. See Offerdahl v. University of Minn. Hosps. & Clinics, 426 N.W.2d 425, 428 (Minn. 1988); Watkins v. Fromm, 108 A.D.2d 233, 239 (N.Y. 1985). In Offerdahl, supra, the plaintiff was a student at the University of Minnesota who "did not seek treatment from any particular University physician but employed the University clinic generally as her physician." The Supreme Court of Minnesota held that although the claim was based upon negligence by a particular physician of the clinic, "under these unique facts where the patient sought treatment from a clinic as a whole rather than an individual physician, the treatment of the clinic as a whole, rather than that of the individual physician alleged to have committed the act of malpractice, is

relevant for purposes of determining when treatment terminated and the statute of limitations began to run." Id. Similarly, in Watkins, supra at 234-235, the Appellate Division of the Supreme Court of New York held that the continuing treatment doctrine tolled the statute of limitations where ongoing treatment was provided by members of the negligent physician's medical group because, according to deposition testimony, the plaintiff "was considered to be a patient of the entire medical group, rather than of any one of the individual doctors, and that it was the practice of the defendant doctors to discuss, as a group, the diagnosis and treatment of all of the patients under their care." Those factual circumstances are not presented here. There is no evidence in the record that William was treated as a patient of the sarcoma group rather than of the particular physicians providing treatment, that the physicians in the group discussed the diagnosis or treatment of all their patients with the group, or that William's parents believed him to be a patient of the group rather than of individual physicians.

We have considered whether the reasons that underlie the continuing treatment doctrine justify the application of the doctrine where the allegedly negligent physician and the physician who continues to treat the patient once were together part of a patient's "treatment team." We recognize that, in

these circumstances, there is a risk that a patient's continued trust and confidence in the physician providing continuing care might put the patient at a disadvantage in making an informed judgment as to whether a former team member provided negligent treatment, especially where the physician providing the continuing care effectively brought the allegedly negligent physician onto the team.  We also recognize that there is a risk that, if a plaintiff were to contemplate a medical malpractice action against a former team member, the plaintiff might reasonably fear that exploring an action against that physician would interrupt or otherwise interfere with the patient's continuing treatment with other members of the team because of their respect for and close connection with that physician.

We are reluctant, however, to extend the continuing treatment doctrine to a "treatment team" for two reasons. First, tolling the statute of limitations while the plaintiff continues to be treated by a "treatment team" that once included the allegedly negligent physician poses the risk that what was intended to be a narrow exception may be interpreted so broadly as to devour the discovery rule in medical malpractice cases. Second, given the multitude of different ways in which patients receive medical treatment in this Commonwealth, it is difficult to define with precision a patient's "treatment team."  The absence of a precise definition means not only that it would be

difficult at trial to instruct a jury regarding the statute of limitations but, more importantly, it would be difficult to determine whether a case should be dismissed before trial on statute of limitations grounds.  The clarity and precision of a limitations period is important to the interests of justice, because it enables untimely filed cases to be dismissed before trial, thus sparing all parties the needless time, expense, and burden of a trial where the jury will never reach an adjudication on the merits.

Because, having balanced the competing considerations, we are unwilling to apply the continuing treatment doctrine to the plaintiff's continued treatment by a "treatment team" that once included the defendant, the doctrine does not apply in this case after December, 2005.  And without the tolling of the statute of limitations beyond that date under the continuing treatment doctrine, the plaintiffs' medical malpractice claim was not timely filed.

Conclusion.  We affirm the judgment in favor of the defendant and the order denying the plaintiffs' motion for a new trial.

So ordered.

CORDY, J. (dissenting in part).  The court's decision today fails to consider several factors that strongly militate against adopting a continuing treatment exception to our settled discovery rule for medical malpractice claims.  Instead, the court imprudently intrudes into a critically important sphere of health care policymaking and makes its own preferred policy judgment without any inkling of the effect it might have on the cost of health care in Massachusetts, a matter of acute concern to the executive and legislative branches of government.  These branches are far better equipped to balance the benefits of a prolonged statute of limitations with the cost and access issues it implicates.  Just because the court can act to change the law does not mean that it should.  Therefore, I respectfully dissent from the court's adoption of the continuing treatment doctrine for medical malpractice cases.

For nearly forty years, our law has been clear:  a cause of action for medical malpractice "accrue[s] when the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct."  Franklin v. Albert, 381 Mass. 611, 619 (1980).  See G. L. c. 231, § 60D.  Once the harm and its causal relationship to acts of the physician is known or reasonably should have been learned, the statute of limitations clock starts to run, and the patient has three years to

determine whether to file suit.  See Bowen v. Eli Lilly & Co.,
408 Mass. 204, 208 (1990).

Although I agree with the court's articulation of our rule
that, in the absence of explicit legislative direction, it may
determine, as a matter of common law, when a cause of action
accrues, and hence when the limitation period begins to run, see
Franklin, 381 Mass. at 617, the absence of explicit statutory
language does not mean that the court should act to change
settled law in a manner inconsistent with legislative
objectives.  See Rosenbloom v. Kokofsky, 373 Mass. 778, 780
(1977).  In this case, the adoption of the continuing treatment
doctrine runs contrary to the legislative aims undergirding the
Commonwealth's medical malpractice statutory framework and
ignores decades of work and study by the executive and
legislative branches regarding reducing the cost of health care
in the Commonwealth, ensuring both affordability and access.[1]

---

[1] The Legislature has committed extensive resources to
understanding and addressing the issue of rising health care
costs, not only in the area of medical malpractice, but across
the health care industry as a whole.  See House Committee Report
concerning 2012 Senate Bill No. 2400, The Next Phase of
Massachusetts Health Care Reform (between 2009 and 2020, "health
spending is projected to double, outpacing both inflation and
growth in the overall economy.  The rapid rate of growth
squeezes out other spending, for individual households, for
businesses, for communities and in the state budget.  That is
why this effort [to address rising health care costs while
improving health care quality and patient care] is essential for
our long-term economic competitiveness and for the health of our
residents").  To that end, it has mandated that various

Indeed, the court's ignorance of the impact on the cost of health care of its sudden change of mind on the accrual of malpractice claims is staggering.[2]  If ever there was a case that

---

executive agencies, including the Health Policy Commission, the office of the Attorney General, and the Department of Public Health, monitor and report on the costs of health care in the Commonwealth.  See G. L. c. 6D, § 8, as amended by St. 2013, c. 35, § 3 (mandating annual hearings and report concerning health care expenditures); G. L. c. 12, § 11N (mandating that Attorney General "monitor trends in the health care market" and granting authority to investigate medical providers and payers); G. L. c. 12C, § 17 (Attorney General tasked with investigating information "related to health care costs and cost trends, factors that contribute to cost growth within the commonwealth's health care system and the relationship between provider costs and payer premium rates"); St. 2012, c. 224, § 272 (mandating that Department of Public Health "create an independent task force . . . to study and reduce the practice of defensive medicine and medical overutilization in the commonwealth . . . . The task force shall file a report of its study, including its recommendations and draft of any legislation, if necessary . . .").

These agencies produce extensive annual reports on the issue of rising health care costs, as well as recommendations across a wide range of health care policy issues.  See, e.g., Health Policy Commission, 2015 Cost Trends Report, http://www.mass.gov/anf/budget-taxes-and-procurement/oversight-agencies/health-policy-commission/publications/2015-cost-trends-report.pdf [https://perma.cc/C7ME-KMGN]; Office of the Attorney General, Examination of Health Care Cost Trends and Cost Drivers, (Sept. 18, 2015), http://www.mass.gov/anf/budget-taxes-and-procurement/oversight-agencies/health-policy-commission/annual-cost-trends-hearing/2015/cost-containment-5-report.pdf [https://perma.cc/XK7N-S74D]; Center for Health Information and Analysis, Performance of the Massachusetts Health Care System, Annual Report, (Sept. 2015), http://www.chiamass.gov/assets/2015-annual-report/2015-Annual-Report.pdf [https://perma.cc/5DZ6-VW2V].

[2] The court writes that there is no reason to believe, let alone adequate factual information in the record, to support a belief that adoption of the continuing treatment doctrine will

cried out for judicial restraint and deferral to the branches of government best equipped to strike the proper balance between ensuring affordable and available health care with the protection of injured patients, this is it.

1.  *Legislative intent*.  After our adoption of the discovery rule in Franklin, the Legislature amended G. L. c. 231, § 60D, regarding the limitations period during which a minor might bring a claim for medical malpractice.  See St. 1986 c. 351, § 23.  The legislative history is clear that the Legislature knew that we had adopted the discovery rule, and this knowledge informed the course of the statute's amendment. See Annual Report of the Special Commission Relative to Medical Professional Liability Insurance and the Nature and Consequences of Medical Malpractice, 1987 House Doc. No. 5262.[3]  In addition,

_____

affect enough claims to have any meaningful impact on the cost of medical malpractice insurance.  See ante at note 16.  This argument underscores the obvious:  the court simply cannot know, in the way the Legislature can, whether or how adoption of the doctrine will affect the cost of medical malpractice insurance. However, where concern over such costs has been a major driver behind legislative reform in this area, see discussion infra, it seems apparent to me that the court should take a more cautious approach to redefining this area of settled law.

[3] The Special Commission Relative to Medical Professional Liability Insurance and the Nature and Consequences of Medical Malpractice (commission) was established by St. 1975, c. 362, § 12.  Its purposes included making recommendations to ameliorate the high cost of medical malpractice insurance.  The report, which issued in 1987, discussed the issues that led to the current version of G. L. c. 231, § 60D, including the enactment of the current limitations period:

our prior cases have carefully considered the intent of the Legislature in enacting major pieces of medical malpractice legislation, St. 1975, c. 362, and St. 1986 c. 351, and we have repeatedly acknowledged its concern regarding the costs associated with medical malpractice litigation and its efforts to ameliorate the costs of medical malpractice insurance.  See, e.g., Darviris v. Petros, 442 Mass. 274, 283-284 (2004) (describing medical malpractice act of 1986 as "an exhaustive statutory scheme governing medical malpractice claims" and concluding that "[e]xpanding the scope of damages available to plaintiffs who are victims of medical malpractice, and the period within which to make such claims, is contrary to the express intent of the Legislature in enacting St. 1986,

---

> "Most actuarial experts that testified before both the Special Commission and the Committee on Insurance stated meaningful savings would be realized by a change to the statute of limitations. At present, an action may be commenced within three years of discovery that there are grounds to initiate a suit for medical malpractice, but there is no limit on the time period in which such discovery must be made. Under Chapter 351, the statute of limitations for medical malpractice actions would be revised to place an outside limit on the time which a lawsuit may be commenced, that limit being seven years after the date of the occurrence which gave rise to the claim, except when the action is based upon the leaving of a foreign object in the body in which case no outside limit shall apply (Section 30, Chapter 351)."  (Emphasis added.)

Annual Report of the commission, 1987 House Doc. 5262, at 9.

c. 351"); <u>McGuiggan</u> v. <u>New England Tel. & Tel. Co</u>., 398 Mass. 152, 163 (1986) (Lynch, J., concurring) ("[T]he General Court has recently limited the amount that may be recovered by victims of medical malpractice in an attempt to solve what it perceives as a crisis in the medical profession brought about by the burgeoning cost of malpractice insurance. St. 1986, c. 351. The Legislature has acted to restrict recovery by injured litigants in order to limit the expense of practicing medicine"). See also <u>Paro</u> v. <u>Longwood Hosp</u>., 373 Mass. 645, 647 (1977) (tribunal requirement of medical malpractice act of 1975 was enacted "as part of a comprehensive package designed to ensure the continued availability of medical malpractice insurance at a reasonable cost)".

In sum, the result reached by the court today is anomalous in light of the legislative history and intervening decisions of this court, which recognize that the medical malpractice statutory framework is intended to moderate the cost and expense of medical malpractice litigation and that such a purpose is accomplished, in part, by the statute of limitations period. The court notes that the absence of legislative action cannot be interpreted as an affirmative rejection of the continuing treatment doctrine. In reaching this conclusion, however, the court ignores the fact that the statutory scheme was developed in tandem with the common law, and that expanding the period in

which a medical malpractice claim may be brought markedly departs from the clear policy aims the Legislature sought to accomplish by repeatedly enacting legislation addressing malpractice claims, insurance, and the objective of reducing the time of exposure to such malpractice claims. See note 2, supra.

Finally, it is notable that the Legislature did include express "exceptions" to the limitations period in G. L. c. 231, § 60D. First, there is an exception so any child under the age of six "shall have until his ninth birthday" to bring a claim. Second, the seven-year statute of repose has an exception for "the leaving of a foreign object in the body." Id. Given the Legislature's consideration and inclusion of these exceptions, I cannot conclude that a "continuing treatment" exception should be inferred where it was not included by the Legislature. "The fact that the Legislature specified one exception . . . strengthens the inference that no other exception was intended." Joslyn v. Chang, 445 Mass. 344, 350 (2005), quoting LaBranche v. A.J. Lane & Co., 404 Mass. 725, 729 (1989).

Thus, contrary to the court's conclusion, it is apparent that, in the medical malpractice context, the Legislature has concurred with, and maintained, our uniformly applied "accrual" standard, as articulated in Franklin.[4] The statutory history and

---

[4] To the extent that the court relies on decisions from other jurisdictions in adopting the continuing treatment

framework reflect a legislative choice to balance the goals of protecting defendant health care providers from extended tort exposure from stale claims, and of eliminating the "manifest injustice" which would result without the discovery rule for plaintiffs who are "blameless[ly] ignoran[t]" of information which might have put them on inquiry notice for purposes of investigating and possibly pursuing a claim.  See Franklin, 381 Mass. at 618.

The decision today elevates this latter policy concern over the former, based on the court's belief that the continuing treatment exception to the discovery rule would benefit patients by addressing a shortcoming it perceives in our current law, namely that patients are unable to make informed judgments as to negligent treatment while such treatment is ongoing.  See, e.g., Harrison v. Valentini, 184 S.W.3d 521, 524 (Ky. 2005).  In adopting the continuing treatment exception, however, the court fails to consider future impacts to the health care industry -- impacts to which the Legislature has dedicated decades of study and, in response, carefully crafted legislation that reflects an effort to best balance competing policy concerns.  Where the Legislature's policy determinations are fairly clear, the court should defer to those judgments.

---

doctrine, those cases do not affect my view of what the Legislature intended.

2.  Adopting the exception by analogy.  I also disagree with the court's reasoning that our adoption of the continuing representation doctrine to the discovery rule in legal malpractice claims, see Murphy v. Smith, 411 Mass. 133, 137-138 (1991), justifies the adoption of a continuing treatment exception to the discovery rule in medical malpractice claims. I disagree with the proposition that, "just as a wronged client is permitted to benefit from his or her attorney's efforts to correct a problem without the disruption of exploring the viability of a legal malpractice action, so, too, is a patient permitted that same benefit without the disruption of exploring the viability of a medical malpractice action."  Ante at    . This statement both mischaracterizes the rationale underlying the continuing representation doctrine, and downplays the significant differences and interests at stake in those two arenas.

First, with respect to legal malpractice, as we have held, the continuing misrepresentation doctrine "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered" (citation omitted).  Murphy, 411 Mass. at 137. Implicit in the doctrine is an understanding that a person

seeking legal services may not recognize that certain acts or omissions by an attorney constitute malpractice. Our justification of the doctrine says nothing, however, about permitting the representation to continue so that an attorney may correct an error arising from the attorney's conduct; to the contrary, the facts in Murphy suggest that the attorney accused of malpractice did nothing to correct his alleged error. Id.

Moreover, the rationale for adopting the continuing representation doctrine is largely distinguishable from any analogous rule in the medical malpractice context. The "continuing representation" principle that we recognized in the context of legal malpractice arose from assurances given by an attorney that he had attended to a legal issue that had no perceptible manifestation to the client. See id. at 136. In the field of legal malpractice, there are situations, such as the one presented by Murphy, where the attorney may assure the client that a certain task has been carried out correctly and where the client should be able to accept such representations in the absence of information to the contrary. Such a rule makes sense in the legal malpractice context because the alleged act or omission which gives rise to a claim and causes an injury to the plaintiff is caused somewhere other than in the plaintiff's own body, often under circumstances remote from a plaintiff's ability to detect circumstances which might put him

or her on notice of a claim. See, e.g., <u>Murphy</u>, 411 Mass. at 137 (plaintiffs unaware of attorney's purportedly improper certification of good record title until receipt of letter from neighbor's attorney). The same cannot be said about the injury in a medical malpractice case, especially where the defendant's actions had a direct and perceptible effect on the patient's body.

The court also justifies its adoption of the continuing treatment exception by analogy to the continuing representation doctrine in legal malpractice on the ground that the Legislature otherwise used almost identical language to describe the limitations period for medical malpractice claims and for legal malpractice claims. It is apparent, however, that the Commonwealth's legislation governing medical malpractice was enacted in light of a number of competing policy concerns that are unique to the health care industry -- concerns simply not present in the practice of law -- a practice that we as a court regulate.[5]

---

[5] The language in context is different. As discussed, there is a statute of limitations that the Legislature enacted specifically to address medical malpractice and an even more specialized statute for cases involving minors. See G. L. c. 231, § 60D; G. L. c. 260, § 4. The medical malpractice limitations statute includes a statute of repose, but the statute for legal malpractice does not. The medical malpractice statute applicable to juveniles eliminates tolling until the minor's eighteenth birthday (G. L. c. 260, § 7), but the legal malpractice statute does not. Compare G. L. c. 260, § 4, first

    3. <u>Conclusion</u>. The court's adoption of the continuing treatment exception to the discovery rule is inconsistent with the apparent legislative objectives underlying the Commonwealth's medical malpractice statutory regime, particularly G. L. c. 231, § 60D. In my view, the court should apply the settled discovery rule to the facts of this case. As the court acknowledges, the defendant's treatment ceased in December, 2005. Therefore, the plaintiffs' action, brought in 2009, was not timely.

---

par., with G. L. c. 231, § 60D. This express statutory language unmistakably demonstrates that the Legislature intentionally differentiated the medical malpractice and legal malpractice statutes of limitation.